**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| REM OA HOLDINGS, LLC and SIFT FIXED US002, LLC, | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2022-0582-LWW |
| NORTHERN GOLD HOLDINGS, LLC, | ) ) ) ) | |
| Defendant and Counterclaim-Plaintiff, | ) ) ) ) | |
| and | ) ) | |
| REM EQ HOLDINGS, LLC, | ) ) ) | |
| Nominal Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: June 20, 2023
Date Decided: September 20, 2023

Thomas W. Briggs, Jr. & Alexandra Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael C. Holmes, Jeffrey Crough & Thomas Mitsch, VINSON & ELKINS LLP, Dallas, Texas; Matthew R. Freidenberg, VINSON & ELKINS LLP, New York, NY; *Counsel for Plaintiff REM OA Holdings, LLC*

Scott B. Czerwonka & D. Charles Vavala, III, WILKS LAW, LLC, Wilmington, Delaware; *Counsel for Plaintiff SIFT Fixed US002, LLC*

Martin S. Lessner, Elisabeth S. Bradley & M. Paige Valeski, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; *Counsel for Defendant Northern Gold Holdings, LLC*

John D. Hendershot, Matthew W. Murphy & Angela Lam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Nominal Defendant REM EQ Holdings, LLC*

**WILL, Vice Chancellor**

In 2020, America's oldest gun maker—the Remington Outdoor Company—went bankrupt. Richmond Italia and Scott Soura jointly submitted the winning bid for its assets, which were later transferred to REM EQ Holdings, LLC. Italia (through Northern Gold Holdings, LLC) and Soura (through REM OA Holdings, LLC) each held 50% of the company's membership interests and shared decision-making authority. Italia ran the company's day-to-day matters while Soura handled legal and financial undertakings.

It was almost immediately apparent that the company would require significant capital to restore operations. Traditional financing proved unattainable. With the company burning cash, Soura pursued a loan from a Hong Kong entity called SIFT Capital Limited Partners during the spring of 2021. For a time, Italia was kept in the dark.

Soura and SIFT Capital finalized a term sheet that contemplated a $10 million loan in exchange for a warrant to purchase 2.5% of the company's membership interests. Four days later, Soura emailed Italia a series of documents. Soura included a draft written consent authorizing any member or officer of the company to execute the term sheet and all documents related to the term sheet without further approval. The written consent referenced the term sheet multiple times. The term sheet was not, however, sent to Italia.

Italia reviewed the written consent and understood that it contemplated a loan from SIFT Capital. He sent the documents to his accountant and counsel for review. Multiple calls and discussions with Soura and the company's counsel about the documents followed. But Italia did not ask about or request a copy of the term sheet referenced in the written consent. Nor did he propose any changes to the written consent. Instead, after two weeks of review, he signed it.

Soura and the company's officers then negotiated definitive loan documentation with SIFT Capital's assignee SIFT Fixed US002, LLC. The loan transaction closed in January 2022. The company received $10 million and SIFT Fixed received a warrant.

SIFT Fixed exercised its warrant in March 2022. Soura told Italia about the exercise within days. Italia expressed surprise, refusing to accept that Northern Gold was no longer a 50% member of the company.

SIFT Fixed and REM OA filed this action to confirm SIFT Fixed's membership. Given Italia's express authorization of the loan transaction, the matter seems straightforward. The parties have made it anything but.

Northern Gold raised numerous collateral attacks on the transaction ranging from invalidity to voidness. It questions whether SIFT Capital is real, the relevant agreements are forged, and SIFT Fixed's representative at trial was a paid actor.

2

REM OA spun illogical stories to excuse its underhandedness. To make matters worse, trial presented competing narratives from Soura and Italia.

Northern Gold's frustration is understandable. Soura is not blameless and should have been upfront with his business partner. But ultimately, Italia authorized the SIFT transaction when he willingly signed the written consent. Italia—an experienced businessperson represented by counsel—had every chance to ask about the term sheet during weeks of review and negotiation. He opted not to.

Northern Gold does not get a do over for its failed diligence. Delaware law holds sophisticated parties to their contracts. SIFT Fixed was a 2.5% member of the company when this action was filed. Judgment is entered for the plaintiffs.

## I.     FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1] The trial record includes 1,903 exhibits and 5 deposition transcripts.[2] Trial was conducted over two days during which five fact witnesses testified.[3]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 160) ("PTO").

[2] Facts drawn from exhibits jointly submitted by the parties are referred to by the numbers provided on the parties' joint exhibit list and cited as "JX __" unless otherwise defined. Deposition transcripts are cited as "[Name] Dep." *See* Dkt. 166.

[3] Trial testimony is cited as "[Name] Tr." *See* Dkts. 174-75.

## A.  Witness Credibility

Before recounting the factual record, I pause to provide essential framing.  The testimony given by the two primary witnesses at trial—Scott Soura, the principal of plaintiff REM OA Holdings, LLC, and Richmond Italia, the principal of defendant Northern Gold Holdings, LLC—was irreconcilable.  It is obvious that one or both repeatedly lied under oath.[4]  I have relied on documentary evidence where it is available and made careful credibility assessments of oral testimony where it is not.[5]

## B.  Remington Outdoor's Bankruptcy

On July 27, 2020, firearms manufacturer Remington Outdoor Company, Inc. and twelve of its affiliates filed for bankruptcy.[6]  Remington Outdoor was set to be broken up and sold.[7]  Remington Outdoor's Chief Executive Officer Ken D'Arcy approached Richmond Italia about submitting a bid for the assets.[8]  Italia was a

---

[4] Ascertaining the truth is complicated by Soura and Italia's mudslinging.  Their personal attacks on the other range from the troubling to the bizarre.  *See, e.g.*, *infra* notes 205-13, 215 and accompanying text; JX 3; Soura Tr. 124-25.  Suffice it to say that the credibility of these witnesses leaves much to be desired.

[5] Northern Gold raised numerous authenticity objections to certain documentary exhibits. *See* Dkt. 166.  Later in this decision, I conclude that the challenged exhibits are admissible under Delaware Rule of Evidence 901.  *See infra* Section II.C.1 (resolving authenticity objections).

[6] PTO ¶ 21.

[7] *Id.*

[8] Soura Tr. 7; Italia Tr. 304; Soura Tr. 6-7; PTO ¶ 22.  I generally found D'Arcy to be a credible witness.  Although he developed a distaste for Italia (*see* JX 787; D'Arcy Tr. 597; Soura Tr. 103-04; Italia Tr. 435), he seemed motivated by a desire to protect the Company. *See, e.g.*, D'Arcy Tr. 586-90.

successful businessperson who had founded and sold two paintball companies.[9]

Before becoming Remington Outdoor's CEO, D'Arcy had served in that role at one of Italia's companies.[10]

Italia was interested in Remington Outdoor but lacked the funds to meet the bidding requirement of $30 million in liquid assets.[11] Italia reached out to Scott Soura, a social acquaintance, about submitting a joint bid.[12] Soura was also a successful businessperson who had owned and operated several companies.[13]

In October 2020, Soura's wholly-owned entity Roundhill Group, LLC submitted the winning bid of $13 million for Remington Outdoor's firearm division assets.[14] REM EQ Holdings, LLC (the "Company")—the nominal defendant in this action—was formed on October 2 to house the assets.[15] Italia and Soura agreed that they would each contribute half of the bid in exchange for equal 50% ownership of the Company.[16] They also agreed that "[a]ny future investment of capital or equity

---

[9] Italia Tr. 300-04 (testifying that his companies were sold for tens of millions of dollars in profit).

[10] *Id.* at 305-06; D'Arcy Tr. 568; D'Arcy Dep. 41-44.

[11] Italia Tr. 311; Soura Tr. 7.

[12] Italia Tr. 311; Soura Tr. 7.

[13] *See* Italia Dep. 66-67.

[14] Italia Tr. 312; Soura Tr. 8; JX 26. The bid included $2 million in escrowed funds, which were later returned to Soura. Soura Tr. 8; Italia Tr. 312. The assets were eventually transferred to the Company. *See infra* note 31 and accompanying text.

[15] JX 239; PTO ¶ 17.

[16] JX 26.

may dilute [Italia's] 50% ownership percentage along with Roundhill's (or Roundhill's designated entity) 50% ownership proportionately."[17]  The bankruptcy sale of assets to Roundhill closed on October 12.[18]

## C.    The Company's Governance

After the asset purchase closed, Soura and Italia began formalizing the Company's governance.  On March 24, 2021, Soura sent Italia an initial REM EQ Limited Liability Company Agreement (the "LLC Agreement"), dated as of January 15, 2021.[19]  Soura told Italia that the LLC Agreement was intended to be a "placeholder[] to get the accounts open" to secure a Paycheck Protection Program (PPP) loan and could be revised "to a proper detailed agreement with all the tax, controls and other terms over the next week or two."[20]

The LLC Agreement was executed on March 25, 2021 by Soura on behalf of REM OA Holdings, LLC and by Italia on behalf of Northern Gold Holdings, LLC.[21] REM OA is a Delaware limited liability company managed by Belum Ventures,

---

[17] *Id.*

[18] PTO ¶ 25; JX 195.

[19] JX 131; JX 137.

[20] JX 131.

[21] JX 137.

6

LLC, which is managed by Soura.[22]  Northern Gold is a Delaware limited liability company; Italia is its sole member and manager.[23]

The LLC Agreement established that REM OA and Northern Gold each held a 50% membership interest in the Company.[24]  It listed Soura as the Company's manager.[25]  This designation was in name only.  Soura told Italia on March 24 that he was "listed as the manager of EQ Holdings for now so that [he] c[ould] execute the documents [for the PPP loan] over the next week."[26]  On the day Italia signed the LLC Agreement, Soura sent Italia a letter resigning as manager of the Company, effective April 2, 2021.[27]

Soura and Italia decided to divide responsibilities, with Soura handling financial and legal matters and Italia handling day-to-day operations.[28]  D'Arcy was

---

[22] Verified Compl. (Dkt. 1) ("Compl.") ¶ 3.

[23] Answer to Verified Compl., Affirmative Defenses, and Verified Countercl. (Dkt. 18) ("Answer and Countercl.") ¶ 5.

[24] PTO ¶ 27; JX 137; JX 1642 ("LLC Agreement" dated Jan. 15, 2021) at Ex. A.  The initial LLC Agreement called ownership interests "Membership Interest[s]."  LLC Agreement § 1.2.  Subsequent amendments called the membership interests "Units."  *See infra* note 143.

[25] PTO ¶ 27; LLC Agreement at 9.

[26] JX 131 (explaining that they could change the manager designation the "next week if [Italia] want[ed]").

[27] PTO ¶ 28; JXs 139-40.

[28] JX 32 at 3 (Italia asking Soura: "Do u want me to deal with the day to day and let u deal with the big picture stuff, no need for both of us to stress over the little things"); JX 69 at 1 (Italia stating that Soura's "responsibilities amongst others are handling financial and

hired as the Company's Chief Executive Officer.[29] Melissa Anderson, who had previously served as Remington Outdoor's Vice President of FP&A, IT and Internal Financial Reporting, was hired as the Company's Chief Financial Officer.[30]

The purchased assets were eventually transferred from Roundhill to the Company and the Company's subsidiaries through agreements dated June 2, 2021.[31]

## D. The Company's Financing Needs

The Remington Outdoor firearm assets were not operational, and the Company had negative cashflow upon its formation.[32] Italia and Soura recognized that the Company needed substantial capital to restart operations and become competitive.[33] They estimated the Company's long-term funding needs to exceed

---

legal affairs of remarms"); JX 615 ("As agreed I'm [Italia] staying out of the legal stuff."); Soura Tr. 14-15; Italia Tr. 316-17, 477-78; D'Arcy Tr. 572.

[29] D'Arcy Tr. 566.

[30] Anderson Dep. 28, 235. D'Arcy and Anderson were initially hired as CEO and CFO of RemArms LLC, a subsidiary of the Company. *Id.* at 223; Anderson Tr. 611. Later, pursuant to a May 14, 2021 written consent, D'Arcy and Anderson were designated as the Company's CEO and CFO. *See* D'Arcy Dep. 223; Anderson Tr. 611; *see infra* note 113 and accompanying text. I found Anderson to be a highly credible witness. *See supra* note 8 (discussing D'Arcy).

[31] PTO ¶ 25; *see infra* note 142 and accompanying text.

[32] Soura Tr. 11-12; Italia Tr. 318-19, 471-72; Italia Dep. 83; Anderson Tr. 614-15.

[33] JX 14 at 2 (Italia texting on September 28, 2020: "Budget to rebuild Remington to its glory is 25-40m over and above purchase price of 13m usd"); JX 32 at 3 (Italia texting on October 14, 2020: "We knew its [sic] was going [] to take 25.m to get this going"); Soura Tr. 11-12; Italia Tr. 317-18 (testifying that $10 million was needed to reach a "break-even point" but that $30 to $40 million was needed "to [make the Company] a real competitor"); *see* D'Arcy Tr. 570.

the $13 million purchase price by $25 million to $40 million.[34] D'Arcy and Anderson concurred.[35]

Soura led the Company's financing efforts, consistent with the division of labor he and Italia had agreed upon. On January 21, 2021, Soura told Italia that he was "working on raising $25-30 m[illion]" structured "as a combination of preferred and common equity with a non-controlling stake."[36] Italia replied with a thumbs up emoji.[37] At the same time, Soura (with Anderson's assistance) worked towards securing the PPP loan.[38] Italia approved of Soura's efforts to close the PPP loan but did not involve himself in the process.[39]

The Company received $10 million from the PPP loan on March 29, 2021 but needed additional capital to execute on its plans and meet its financing goals.[40] The

---

At trial, Italia testified that he believed that the Company was "monetarily . . . pretty solid in the early months" due to sales of equipment and inventory and a cash infusion from the consortium that the Company joined as part of the Remington Outdoor auction. Italia Tr. 318. This belief is belied by contemporaneous documentary evidence. For example, cash flow projections prepared by Anderson showed that, without additional financing, the Company would run out of cash before May 2021. *See* JX 119; *see also* JX 1902; JX 125; JX 128.

[34] *See supra* note 33.

[35] D'Arcy Tr. 570-73; Anderson Tr. 614-16.

[36] JX 71.

[37] *Id.*; *see* Italia Tr. 483-84.

[38] JXs 1658-59; Soura Tr. 16.

[39] Italia Tr. 478, 481-82; Soura Tr. 19; *see supra* notes 26-27 and accompanying text.

[40] Anderson Tr. 612; D'Arcy Tr. 573-74; JX 1661 at 1.

Company was also burning through cash at an alarming rate.[41] A March 2021 cash flow projection prepared by Anderson estimated that, without the PPP loan, the Company would have run out of cash by the end of April.[42] That same projection estimated that the Company would deplete $5 million of the remaining PPP funds by the end of May.[43] Italia grew concerned about the Company's cash burn, remarking to D'Arcy and Soura on July 6 that the "funds in the bank [we]re diminishing" and that "[a]t this rate we will need another round of funding very soon."[44]

The Company's financing needs were partly driven by plans to relocate its headquarters.[45] In October 2020, Italia had begun exploring incentives to open a manufacturing facility in the State of Georgia.[46] About a year later, around October

---

[41] Cash flow projections prepared by Anderson reflected the Company's high cash burn. *See* JX 1902 (native); JX 119 (native); JX 125 (native); JX 128 (native); JX 142 (native); JX 1737 (native); JX 150 (native); JX 1780; JX 1903; JX 666; JX 761; JXs 1719-21; JX 912.

[42] JX 142 (native).

[43] *Id.* The projections for March 2021 through February 2022 reflect the $10 million cash injection from the PPP loan but show that the Company would go through the funds quickly. *See supra* note 41 (citing exhibits). Anderson's credible testimony at trial further supports a finding that the Company began using the PPP loan funds before the fall of 2021. Anderson Tr. 628 ( "I knew that we were depleting through the money. . . ."). Her deposition testimony is consistent. Anderson Dep. 63.

[44] JX 635; *see* Italia Tr. 485-88; *see also* JX 627 (Italia texting Soura on June 17, 2021 and expressing alarm that the Company's bank "[a]ccount [wa]s going down scary fast").

[45] Soura Tr. 293-94; Italia Tr. 464-65.

[46] PTO ¶ 37; *see* JX 24; JXs 41-42; JXs 47-48. These discussions continued through the end of 2020 and into 2021. *See* JX 54; JX 56; JXs 86-88; JX 91; JX 126; JX 623; JX 1703

10

2021, the Company committed to relocating to LaGrange, Georgia.[47] It expected to incur significant expenses from building the facility.[48]

Italia, Soura, and D'Arcy understood that traditional bank loans were not a viable option given the Company's financial struggles and involvement in the firearms industry.[49] The Company approached traditional lenders but was turned away.[50] Consequently, Soura searched for alternative sources of funding.

### E.    The Potential SIFT Transaction

In late March 2021, Soura mentioned the Company's financing challenges to an attorney assisting him with an unrelated matter.[51] The attorney introduced him to SIFT Capital Limited Partners, a Hong Kong company.[52] SIFT Capital is an asset

---

¶¶ 24-27.  In February 2021, D'Arcy took over the negotiations at Italia and Soura's request.  JX 1703 ¶ 24.

[47] PTO ¶¶ 38-40; JX 707.  On November 8, 2021, the Governor of Georgia announced the relocation.  JX 707.

[48] JX 1817; JX 1703 ¶¶ 34-35; *cf. infra* note 240 and accompanying text.

[49] D'Arcy Tr. 574 ("[R]aising funds through traditional banking is a huge challenge for a firearms company.  Now add the layer on where you're a startup company with no positive cash flow, with debt, . . . and it's next to impossible to get any funding."); Italia Dep. 93-95; Soura Tr. 21, 204.  D'Arcy explained that in early 2022, the Company was in a better position to "start having conversations" with traditional lenders.  D'Arcy Dep. 164-67.  But there is no credible evidence that the Company could have obtained a standard, asset-backed loan at this time.

[50] D'Arcy Tr. 575; Italia Dep. 94-95; Soura Tr. 21, 204; *cf.* JX 1825.

[51] Soura Tr. 21-24.

[52] *Id.*  At trial, Soura testified about what the attorney told him during this conversation. Northern Gold objected to the testimony under Delaware Rules of Evidence 602 and 802. *Id.* at 22.  The testimony is inadmissible because the declarant (Soura's attorney) did not testify at trial and Soura's testimony about her statements is hearsay.  The testimony does

manager licensed by Hong Kong and Chinese regulators.[53] A phone call was arranged between Soura and SIFT Capital's Chief Executive Officer, Zhe Zhang.[54]

During the introductory call between Soura and Zhang, Zhang described SIFT Capital, its investment criteria, and the types of loans it typically provided.[55] Soura told Zhang that the Company "was looking for a [$]10 to $15 million loan" with "a five-year maturity that would be interest only and would subordinate to a senior bank facility that [it] intended to get in the near future."[56] After the call, Soura researched Zhang and SIFT Capital by reviewing SIFT Capital's website and regulatory filings.[57]

---

not—as REM OA argues—fall within the state of mind exception in Rule 803(3). First, the declarant's statements do not go to her "then-existing state of mind (such as motive, intent, or plan) or [her] emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." D.R.E. 803(3). Second, Soura's testimony cannot be used to prove facts purportedly remembered by Soura's attorney. *See* Soura Tr. 23. The state of mind exception does not apply to the declarant's "statement[s] of 'memory.'" *Capano v. State*, 781 A.2d 556, 608 (Del. 2001); D.R.E. 803(3) (excluding "statement[s] of memory or belief to prove the fact remembered or believed" from the state of mind exception).

[53] JXs 1677-78; *see also* JX 1679 at 8.

[54] Soura Tr. 24.

[55] *Id.* This testimony recounting Zhang's statements is not being offered for the truth of the matter asserted. Rather, the statements are being used to prove that the conversation between Soura and Zhang occurred. Later, I address Northern Gold's argument that there is no evidence SIFT Capital and its principals exist. *See infra* notes 301-07 and accompanying text.

[56] Soura Tr. 24.

[57] *Id.* at 25-27.

12

Soura and SIFT Capital continued their discussions through April 2021.[58] SIFT Capital requested due diligence from the Company and opened a data room to facilitate the exchange of documents.[59] According to Soura, the data room was controlled by SIFT Capital and accessible through its website.[60]

By the end of April 2021, SIFT Capital's potential investment in the Company had solidified.[61] SIFT Capital would provide a $10 million interest-only loan with a three-year maturity.[62] SIFT Capital would also receive a warrant to purchase 2.5% of the Company's units at a nominal exercise price.[63] These conditional terms were subsequently memorialized.[64]

---

[58] *Id.* at 27-28. Soura testified that he had video calls with SIFT Capital, using links sent through WeChat and an iPad owned by his fiancée. Soura Dep. 67-70. But no WeChat messages were produced, the iPad was apparently discarded, and the data room was eventually closed. *See* Soura Dep. 70-71; JX 1910 at 2.

[59] Soura Tr. 28-29; JX 639 (SIFT Capital due diligence request list); *cf.* JX 1685.

[60] Soura Tr. 28-29. There is no documentary evidence of the data room or its contents. *See infra* note 309 and accompanying text (declining to draw an adverse inference regarding the data room). Still, it seems more likely than not that the data room existed and was used by SIFT Capital to facilitate due diligence. The use of a data room to facilitate due diligence is commonplace, and Soura's testimony was consistent.

[61] Soura Tr. 28; *see* JX 206.

[62] Soura Tr. 31; *see* JX 206 at 2.

[63] Soura Tr. 31, 34-35; *see* JX 206 at 3.

[64] *See* JX 206; JXs 208-10.

## F. The Commitment Letter

SIFT Capital sent Soura the first draft of a term sheet for its investment on May 7, 2021.[65] Soura sent SIFT Capital revisions to the term sheet the same day.[66] Two days later, on May 9, SIFT Capital sent an updated term sheet incorporating Soura's revisions.[67] An hour later, Soura sent further revisions addressing minor

---

[65] Soura Tr. 35; *see* JX 206 at 2. SIFT Capital was represented by an attorney in Hong Kong. Soura Tr. 27, 39; *see* JX 206; JX 208.

[66] Soura Tr. 35-37; JX 206. Northern Gold objected to the authenticity of the Commitment Letter, among other SIFT-related documents. *See infra* Section II.C.1 (resolving authenticity objections). At post-trial argument, I asked whether there was any metadata showing the creation date of the documents (JX 206; JXs 208-10; JXs 617-19). *See* Dkt. 196. REM OA subsequently provided me with a chart of metadata showing that the documents were created on the dates reflected on their faces. Dkt. 190. For example, JX 206 purports to have been sent on May 7, 2021; the metadata for JX 206 confirms that this document was created on May 7, 2021. *See* Dkt. 190; *see also* Dkt. 197. Northern Gold raised concerns with the metadata and asked that I decline to consider it. Dkt. 195.

Absent the metadata, I find by a preponderance of the evidence—between the documents themselves, the trial testimony, and other circumstantial evidence—that the documents were created on the dates reflected on their faces. The weight of the evidence does not indicate the documents were doctored or created after the fact. *See infra* Section II.C.1. The metadata helpfully confirms this finding but is not required to make it. Regardless, my review of the metadata is not prejudicial to Northern Gold. The metadata was produced to Northern Gold during discovery. Dkt. 190. Northern Gold also cited to metadata in its briefing, though that metadata was not introduced at trial. Def.'s Post-trial Answering Br. (Dkt. 183) ("Def.'s Answering Br.") 28, 35, 58; Def.'s Pre-trial Br. (Dkt. 157) 24, 34.

[67] Soura Tr. 36-37; JX 208. The metadata for JX 208 confirms that the document was created on May 9, 2021. Dkts. 190, 197; *see supra* note 66.

14

typographical issues.[68]  SIFT Capital then sent Soura a commitment letter attaching a final term sheet (the "Commitment Letter").[69]

The Commitment Letter is eight pages long.  The first two pages consist of SIFT Capital's cover letter, signed by Zhang;[70] the third page is a signature page for the Company and several subsidiaries;[71] and the last five pages are the term sheet that Soura and SIFT Capital negotiated.[72]  The document provided that SIFT Capital would purchase a promissory note with a warrant for a total of $10 million.[73]  The note would have a three-year maturity, accrue interest at 7.5%, and be subordinate to any senior bank debt.[74]  The warrant would allow SIFT Capital to purchase 2.5% of the Company's units at an exercise price of $0.01 per unit.[75]  The Commitment Letter also contemplated definitive documentation to consummate the transaction:

> Upon receipt by the undersigned [SIFT Capital] of an executed counterpart of this commitment letter, our obligation to purchase from

[68] Soura Tr. 37-39; JX 209.  The metadata for JX 209 confirms that the document was created on May 9, 2021.  Dkts. 190, 197; *see supra* note 66.

[69] Soura Tr. 39-40; JX 210.  The metadata for JX 210 confirms that the document was created on May 9, 2021.  Dkts. 190, 197; *see supra* note 66.

[70] JX 210 at 1-2 ("SIFT Capital agrees to purchase ten million US dollars ($10,000,000) principal amount of Subordinated Notes (the 'Notes') with detachable Warrants to purchase ownership/membership interests of the Company (the 'Warrants') with a nominal exercise price to be issued by REM EQ.").

[71] *Id.* at 3.

[72] *Id.* at 4-8.

[73] *Id.*

[74] *Id.*

[75] *Id.*

the Company, and the Company's obligation to issue, sell and deliver to us the Notes and Warrants shall become a binding agreement between us subject to the conditions set forth herein.[76]

Around this time, Soura told D'Arcy about the SIFT Capital investment.[77] Soura relayed high-level details of the transaction to D'Arcy, leaving out the warrant and the lender's identity.[78] D'Arcy expected that the deal would involve a warrant, which he believed was commonplace in such transactions.[79] Soura also told D'Arcy that he planned to give Italia a copy of the Commitment Letter during an upcoming meeting in Ilion, New York.[80]

---

[76] *Id.* at 2.

[77] Soura Tr. 32 (testifying that he told D'Arcy about the deal in the first week of May); D'Arcy Tr. 576-77 (testifying the conversation occurred in May or June 2021); *id.* at 601 (testifying the conversation occurred in May 2021). To the extent that D'Arcy's trial testimony is inconsistent with his deposition testimony, I found D'Arcy's trial testimony that he later refreshed his recollection to be credible. *See* D'Arcy Dep. 167-69 (testifying that he was unsure when the conversation occurred); D'Arcy Tr. 600-01 (testifying on cross-examination that he refreshed his memory after his deposition); *see also supra* note 8.

[78] Soura Tr. 145; D'Arcy Tr. 576, 602; *see also* D'Arcy Dep. 167-69. D'Arcy did not learn the specific details of the deal until later, when the loan was being negotiated and finalized. D'Arcy Tr. 576, 602; D'Arcy Dep. 171, 176. To the extent there is conflicting testimony about whether D'Arcy ever saw the Commitment Letter, the weight of the evidence suggests that he did later while definitive documentation was negotiated. *Cf.* D'Arcy Tr. 602-05; JX 1703 ¶ 14; D'Arcy Dep. 239.

[79] D'Arcy Tr. 578-79; D'Arcy Dep. 167.

[80] Soura Tr. 44-45; D'Arcy Tr. 576-77 (corroborating Soura's account). Northern Gold objected to the admissibility of D'Arcy's testimony about what Soura told him. *See* D'Arcy Tr. 577. D'Arcy's testimony is admissible as a statement of Soura's intent under Delaware Rule of Evidence 803(3). *See State v. MacDonald*, 598 A.2d 1134, 1137-41 (Del. Super. 1991) (citing *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892)). In addition, I do not accept the testimony for the truth of the matter asserted—i.e., that Soura gave a copy of the Commitment Letter to Italia during the Ilion meeting.

### G. The Ilion Meeting

On May 10, 2021—the day after Soura received the Commitment Letter from SIFT Capital—Soura and Italia met at the Company's factory in Ilion, New York.[81] By this point, Soura's and Italia's relationship had become strained.[82] Italia was frustrated because Soura had yet to transfer the Remington Outdoor assets from Roundhill to the Company, though the bankruptcy sale had closed seven months earlier.[83]

On the morning of May 10, Italia and a small entourage took a private flight from Fort Lauderdale, Florida to Ilion,[84] while Soura drove by himself from his home in Newtown, Pennsylvania.[85] Italia arrived at the factory first.[86] He set up in a conference room, met with several senior staff at the factory, and briefly walked through the facility.[87] When Soura arrived in the afternoon, Italia guided him to the conference room for lunch.[88]

---

[81] PTO ¶ 29.

[82] Soura Tr. 149; Soura Dep. 18-19; Italia Tr. 338-40.

[83] Italia Tr. 338-39.

[84] *Id.* at 341-42. The members of Italia's group included his son, several business acquaintances, and friends. *Id.*

[85] Soura Tr. 152; Soura Dep. 28.

[86] Italia Tr. 343; Soura Tr. 151; Soura Dep. 28, 139.

[87] Italia Tr. 343.

[88] Soura Dep. 29; Soura Tr. 151; Soura Tr. 45.

At this point, Italia's and Soura's narratives diverge sharply.[89]

Soura testified that after lunch, he was shown the factory by an employee before returning to the conference room with Italia and Italia's group.[90] He said that, at some point after the tour, he and Italia "broke off" to a separate room where he showed Italia a copy of the Commitment Letter that he had printed earlier in the day.[91] According to Soura, Italia reviewed the Commitment Letter and was "happy with it" because it "was consistent with what [they] had spoke[n] about before."[92] Afterward, Italia, his guests, several factory employees, and Soura went to dinner at a local restaurant.[93]

By Italia's account, his group, several factory employees, and Soura toured the facility together after lunch.[94] After the tour, he recalled that the group returned to the conference room to discuss dinner plans and then went to a local restaurant.[95] Italia testified that he and Soura were never alone on March 10, that they did not

---

[89] *See* PTO ¶ 29.

[90] Soura Dep. 143-44.

[91] *Id.* at 146; *see infra* note 100 (discussing inconsistencies on when Soura printed the letter).

[92] Soura Tr. 48.

[93] Soura Dep. 180-83.

[94] Italia Tr. 345.

[95] *Id.* at 346.

discuss financing, and that he was not shown the Commitment Letter.[96]  Rather, Italia first recalled seeing a copy of the Commitment Letter on June 14, 2022 in connection with a filing in this court.[97]

Soura and Italia adamantly stick to their stories, but one of them is lying.[98] The May 10 meeting was not Schrödinger's cat: either Soura gave Italia the Commitment Letter in Ilion, or he did not.  The timing generally supports Soura's account since the Ilion meeting came a few days after the Commitment Letter was signed and before Italia was given documents to authorize the Commitment Letter.[99] Yet Soura's version of the day's events is both illogical and inconsistent.[100]  Thus, I

---

[96] *Id.* at 346-47.

[97] PTO ¶ 29 ("Italia . . . states under oath that no copy of the Commitment Letter was ever provided to him prior to an attachment to a pleading of the Company on June 14, 2022."); *see* JX 1643 ("Commitment Letter"); *N. Gold Hldgs., LLC. v. REM EQ Hldgs., LLC*, C.A. No. 2022-0308-LWW (Dkt. 25) Ex. F (filing dated June 13, 2022).

[98] A popular meme comes to mind.  *See* The Spider-Man Pointing Meme, *in* SPIDER-MAN: DOUBLE IDENTITY (1967), https://screenrant.com/spider-man-pointing-meme-cartoon-origin/ (last accessed September 16, 2023).

[99] *See infra* notes 114-16 and accompanying text.  D'Arcy's recollection that Soura said he planned to share a copy of the Commitment Letter with Italia does not aid Soura.  *See supra* note 80.  An intention does not guarantee corresponding action.

[100] *See* Soura Tr. 44-46 (testifying that he printed the Commitment Letter at his home and printed the Company's organization chart in Ilion); *id.* at 156-60 (testifying that at his deposition he could not recall where and when he printed the Commitment Letter, but he since recalled at trial); Soura Dep. 37-45 (testifying—confusingly—about where and when he printed the Commitment Letter).  Why would Soura print a copy of the Commitment Letter in Pennsylvania and drive it to Ilion when he could have emailed it to Italia? Occam's Razor suggests that he did not.  Soura's story of personally handing Italia a printed copy of the Commitment Letter fortuitously explains away the lack of evidence documenting the receipt or transmission of the Commitment Letter.  Soura Tr. 164-65 ("Q. And the reason you never sent Mr. Italia the commitment letter by email or WhatsApp, or

cannot find that Soura gave Italia a printed copy of the Commitment Letter during the Ilion meeting. On balance, Italia's account seems (slightly) more plausible, consistent, and in line with the meeting's overall purpose.[101]

Despite the intrigue surrounding the day in Ilion, it plays a minor role in the overall story. That is because four days later, SIFT Capital's commitment to invest $10 million in the Company was explicitly disclosed to Italia.

## H. The May 14 Materials

On May 14, 2021, Soura sent Italia an email attaching 56 documents prepared by Company counsel (collectively, the "May 14 Materials"), including:[102]

- draft agreements transferring or assigning the Remington Outdoor assets from Roundhill to the Company and its subsidiaries;[103]

- a draft amended LLC Agreement dated May 14, 2021;[104]

- a draft written consent of the Company's members (the "May 2021 Consent");[105]

---

by any other means to communicate with him, is because you claim that you had already given it to him . . . and he never asked for it again. . . . A. Yes."); *see id.* at 140-41.

[101] *See* Italia Tr. 339-48, 419.

[102] PTO ¶ 30; JX 228. The Company's outside counsel at Shulman Bastian Friedman & Bui LLP prepared the May 14 Materials. Soura Tr. 51.

[103] JXs 229-36.

[104] JX 263.

[105] JX 262. The May 2021 Consent was set up for execution by Soura on behalf of REM OA and Italia on behalf of Northern Gold. *Id.*

- fourteen draft written consents for the Company's subsidiaries (the "Subsidiary Consents");[106] and

- additional copies of signature pages for the draft documents in the package.[107]

The draft amended LLC Agreement attached a Schedule A reflecting that REM OA and Northern Gold were both 50% members of the Company.[108] It also contemplated that the Company was managed "solely and exclusively" by its members,[109] that members could delegate authority to the Company's officers,[110] that the agreement could be amended by written consent,[111] and that new members would be automatically admitted upon the issuance of membership units.[112]

---

[106] The Subsidiary Consents were for seven Company subsidiaries: GS Wood Products LLC, REM FA Holdings LLC, REM MA Holdings LLC, REM MO Holdings LLC, REM TML Holdings LLC, Remarms LLC, and Remops LLC. Seven of the Subsidiary Consents were set up for execution by the governors (Soura and Italia), and seven were to be executed by the Company's members (Soura on behalf of REM OA and Italia on behalf of Northern Gold). JX 259; JX 261; JXs 264-65; JXs 267-68; JX 270; JXs 272-73; JXs 275-77; JXs 279-80.

[107] JXs 283-84.

[108] JX 263 at sched. A.

[109] *Id.* § 4.1(A).

[110] *Id.*

[111] *Id.* § 11.4.

[112] *Id.* at sched. 1.1 ("[A] Person will automatically be admitted as a Member when they are issued Unit(s).").

21

The May 2021 Consent provided for the authorization of various actions, including the appointment of D'Arcy and Anderson as Company officers.[113] It explicitly addressed the Commitment Letter, explaining that the Company had "received a commitment letter with term sheet from SIFT Capital Partners Limited (the '<u>Commitment Letter</u>') to provide financing to the Company in the approximate amount of $10,000,000.00, subject to certain conditions and due diligence."[114] The May 2021 Consent went on to confirm that:

> the Members [REM OA and Northern Gold] have each reviewed the . . . Commitment Letter, and have determined that it is in the best interests of the Company and its stakeholders for the Company to enter into the . . . Commitment Letter and to perform all its obligations contemplated thereby.[115]

Accordingly, the May 2021 Consent authorized:

> any Member or Officer acting alone . . . to execute and deliver . . . the Commitment Letter and all documents relating thereto or contemplated thereby, with such changes as the Member or Officer, as applicable, deems in his sole discretion advantageous to the Company, all without any further act, vote or approval of any Member, Officer or other person or entity.[116]

---

[113] JX 262; *see* Italia Tr. 350 (testifying that the purpose of the May 14 Materials "was the creation of all the new companies, subsidiaries, and partnership agreement and the transfer of all of the inventory to those subsidiaries").

[114] JX 262 (emphasis in original).

[115] *Id.*

[116] *Id.*

The May 2021 Consent referenced the Commitment Letter eight times across each of its three pages. The term "Commitment Letter" is underlined, capitalized, and set apart in parentheses.[117] Six of the Subsidiary Consents similarly defined, described, and provided for the authorization of the Commitment Letter.[118] The May 14 Materials did not include a copy of the Commitment Letter.[119]

Italia testified that he noticed the references to the Commitment Letter in the May 2021 Consent and understood them to mean that the Company had secured a loan from SIFT Capital.[120] Italia "didn't pay much attention to it" because he "didn't know about [the Commitment Letter] . . . [and] didn't know one existed."[121] Because he neither received nor reviewed the Commitment Letter, he was unaware that the SIFT transaction contemplated a warrant.[122] He never asked.

---

[117] *Id.*

[118] JX 259; JX 264; JX 267; JX 273; JX 276; JX 279. Each of these Subsidiary Consents states: "WHEREAS, the Company has received a commitment letter with term sheet from SIFT Capital Partners Limited (the 'Commitment Letter') to provide financing to its Member in the approximate amount of $10,000,000.00, subject to certain conditions and due diligence." *E.g.*, JX 259 at 1 (emphasis in original).

[119] PTO ¶ 31.

[120] Italia Tr. 356-57, 388-90, 397. At his deposition, Italia said that he "knew of no existence of any commitment letter." Italia Dep. 337. He changed his story at trial and admitted that he saw references to the Commitment Letter in the May 2021 Consent and formed a mental impression of the Commitment Letter's purpose. Italia Tr. 356-57. I found his trial testimony believable.

[121] Italia Tr. 399, 400 ("I saw a reference to it. I never gave it any attention because I never received one, so I thought it was a moot point.").

[122] *Id.* at 358, 388-401.

## I. Italia's Review of the May 14 Materials

Shortly after receiving the May 14 Materials, Italia sent them to his accountant and attorney for review.[123] His accountant promptly provided comments on the documents.[124] But due to a potential conflict of interest, Italia's attorney was unable to assist him.[125] On May 17, Italia turned Justin Vineberg of Davies Ward Phillips & Vineberg LLP—Italia's "oldest and trusted lawyer/friend"—for guidance.[126]

Over the next two weeks, Vineberg reviewed the May 14 Materials.[127] Vineberg and Italia had multiple email and phone discussions about the documents with Soura and Company counsel at Shulman Bastian Friedman & Bui LLP.[128] Though tensions ran high at times, the parties and their counsel engaged in productive discussions.[129]

---

[123] JXs 286-88; JX 291; JX 293; Italia Tr. 338, 381; Italia Dep. 229-30.

[124] JX 291.

[125] Counsel had an "ongoing relationship with each of [Italia and Soura]," so he "c[ould not] assist either of [them] individually in editing the[] agreements between [them]." JX 363. Instead, counsel worked "on behalf of Rem EQ Holdings and Remarms, to review the draft documents to determine if they properly reflect [Italia and Soura's] mutual understanding that documents each grant [them] equal voting rights and all decision making be by majority (which, in this case, means unanimous)." *Id.*; *see also* JXs 350-51; JX 375; Soura Tr. 183; Italia Tr. 338, 422.

[126] JX 351; *see* JX 293; Italia Tr. 383. Vineberg's partner, Marc Berger, also assisted. *See* Italia Tr. 351; *see also* JX 396; JX 401; JX 402.

[127] *See, e.g.*, JX 358; JX 370; JX 375; JX 390; JX 396; JXs 401-02; JX 460.

[128] *See, e.g.*, JX 358; JX 370; JX 375; JXs 389-90; JX 392; JX 394; JX 396; JXs 401-02.

[129] Italia Tr. 433-34; Soura Tr. 291. Italia testified that Soura hung up on Vineberg and refused to negotiate. Italia Tr. 385, 428. The testimony is contradicted by the documentary

One area of negotiation concerned a right of first refusal (ROFR) for the sale of a member's interests. Italia had considered selling his units or onboarding other investors since the Company's infancy.[130] But the original LLC Agreement prohibited all transfers of membership interests.[131] Italia pushed for an amendment to the LLC Agreement providing for a ROFR exception to the transfer prohibition.[132] Soura agreed.[133] Italia also made certain that the May 14 Materials effectuated the transfer of the Remington Outdoor assets from Roundhill to the Company and its subsidiaries.[134]

Additionally, Italia was also focused on ensuring that the May 14 Materials maintained Northern Gold's rights in and ownership of the Company relative to REM OA.[135] Soura and Italia asked counsel to confirm that the May 14 Materials

evidence showing that negotiations occurred. *See infra* notes 132-37 and accompanying text; *see also* Italia Tr. 428-31.

[130] Italia Tr. 324, 512; JX 14; JX 57; JX 65; JX 70; JX 73; JX 79; JX 90 at 3 (Italia texting that he was "[g]oing to pursue selling [his] side of the asset"); JX 93; JX 100; JX 104; JXs 107-09.

[131] JX 137 § 5.1; *see* JX 93; JXs 107-09; JX 197.

[132] JX 358; JX 365; JX 368 §§ 5.1-5.2; JX 369 §§ 5.1-5.2; JX 385; Soura Tr. 54; Italia Tr. 423-24, 429-31, 443-44.

[133] JX 368 §§ 5.1-5.2; JX 369 §§ 5.1-5.2; JX 385; Soura Tr. 54; Italia Tr. 423-24, 429-31, 443-44.

[134] JX 358; JX 377; JX 401.

[135] *See* JX 358; JX 385; JX 363; Soura Tr. 53; Italia Tr. 353-55.

gave them "equal voting rights."[136]  In an email to an attorney at Shulman Bastian, Soura reiterated that the May 14 Materials provided for a 50/50 ownership split between Northern Gold and REM OA.[137]

Throughout the parties' discussions and negotiations, neither Italia nor his counsel inquired about the Commitment Letter, asked for a copy of the Commitment Letter, or proposed any changes to the May 2021 Consent.[138]

### J.      Italia Executes the May 14 Materials.

On June 2, 2021, Italia executed the May 14 Materials.[139]  He did not sign under duress.[140]  He sent his completed signature pages to Shulman Bastian.

The next day, Shulman Bastian circulated the fully executed May 14 Materials.[141]  The Remington Outdoor assets were transferred from Roundhill to

---

[136] JX 363 (counsel memorializing a discussion with Soura and Italia); Soura Tr. 195-96 (testifying that he told Italia "REM OA didn't have any special rights that Northern Gold Holdings didn't have"); Soura Dep. 421-22; *see also* Soura Tr. 189; Soura Dep. 410; *supra* note 125 (describing counsel's role).

[137] JX 385; *see also* JX 365.

[138] Soura Tr. 55; Italia Tr. 352; *compare* JX 262 (initial draft) *with* JX 582 ("May 2021 Consent") (executed version).  Italia and his counsel also did not propose changes to the Subsidiary Consents.  *E.g.*, JX 583; JX 585; JXs 587-88; JXs 590-91; JXs 593-94; JXs 596-97; JXs 599-600; JXs 602-03; *see supra* note 106.

[139] JX 461; *see* JX 399.

[140] Italia Tr. 433 ("I was frustrated.  So I don't want to say duress.  I was frustrated at that point.").

[141] JX 581.

REM EQ and its subsidiaries,[142] the amended LLC Agreement became effective,[143] and D'Arcy and Anderson were appointed the Company's CEO and CFO.[144] By operation of the May 2021 Consent, the Company was authorized to execute, and its members and officers to close on, the transaction contemplated by the Commitment Letter "without further act, vote or approval" of its members.[145]

On June 4, Soura executed the Commitment Letter on the Company's behalf.[146] Soura testified that he returned the countersigned copy to SIFT Capital through the data room.[147]

### K. The Ault Letter of Intent

Shortly after executing the Commitment Letter, Soura learned that Italia was negotiating a potential sale of Northern Gold's interests in the Company to Ault Global Holdings, Inc.[148] Soura "slow-walk[ed]" negotiating the definitive

---

[142] JXs 605-14.

[143] The amended LLC Agreement referred to membership interests as "Units," stated that REM OA and Northern Gold each owned 50 units, and changed the Company's governance from manager-managed to member-managed. *Compare* JX 510 *with* JX 137. It was later discovered that the wrong version of the amended LLC Agreement had been circulated, as it did not contain the ROFR agreed on by Italia and Soura. JX 510; *see* JX 372.

[144] JX 581; May 2021 Consent at 2.

[145] May 2021 Consent at 2.

[146] Soura Tr. 59; JXs 617-19; *see* Commitment Letter. The metadata for JX 206 confirms that this document was created on June 4, 2021. Dkts. 190-91; *see supra* note 66.

[147] Soura Tr. 59.

[148] *Id.* at 63; JXs 569-70. Italia had been considering selling his interests or onboarding other investors since the Company's formation. *See* Italia Tr. 324, 512; JX 14; JX 57; JX

documents with SIFT Capital while he waited to see if Italia's sale to Ault would materialize.[149]

On July 7, Italia and Ault executed a letter of intent for Ault to purchase an option to acquire some of Northern Gold's membership interests in the Company.[150] The option would allow Ault to obtain a 44% equity interest and a 50% voting interest, with Northern Gold retaining a 6% equity interest.[151] On July 12, Italia shared the letter of intent with Soura and sent Soura a ROFR notice.[152] Soura and Italia discussed the Ault offer.[153] Soura did not mention the warrant contemplated by the Commitment Letter to Italia.[154]

On July 9, SIFT Capital's counsel Jade Kobeissi (a foreign attorney barred in Beirut, Lebanon and Paris, France) contacted Soura for additional legal and financial

---

65; JX 70; JX 73; JX 79; JX 90 at 3 (Italia texting "[g]oing to pursue selling my side of the asset"); JX 93; JX 100; JX 104; JXs 107-09.

[149] Soura Tr. 62-64. Soura testified that he slowed down the process with SIFT Capital because he hoped that partnering with Ault would enable the Company to negotiate more favorable loan terms. *Id.* at 64, 211. It seems just as likely that Soura was waiting to see whether Italia would remain a significant owner of the Company. *Id.* at 211-15; Soura Dep. 240-244; JX 634 (D'Arcy texting Soura on July 4, 2021 that the Ault Global deal "will get him [Italia] out sooner rather than later [which] will be beneficial").

[150] JX 655; Italia Tr. 359-60.

[151] JX 655.

[152] JX 654; Italia Tr. 360-61.

[153] *See* Italia Tr. 361; Soura Dep. 246.

[154] Soura Tr. 216-19; Soura Dep. 246-47; Italia Tr. 361.

28

due diligence.[155] SIFT Capital was also represented in the transaction by Scott Matthews, a Delaware attorney and partner at Tarabicos, Grosso & Hoffman, LLP.[156] Soura worked with Anderson to collect the diligence materials.[157]

Meanwhile, Italia's talks with Ault stalled.[158] By the fall of 2021, Soura—believing that the Ault deal "was truly . . . dead"—renewed his engagement with SIFT Capital.[159]

## L.    The Definitive Loan Materials

Around October 2021, Soura had several calls with SIFT Capital. Soura testified that during one call, he was introduced to Zakaria Abou Issa, who later played a role in finalizing the SIFT transaction.[160] Negotiations intensified.[161]

On November 2 and 3, Soura emailed SIFT Capital's counsel (Kobeissi) legal diligence materials, including "the consents of the entities consenting to all of the terms of the SIFT commitment letter" (i.e., May 2021 Consent and Subsidiary

---

[155] JXs 639-40.

[156] Soura Tr. 69-70, 80; *see* JX 711.

[157] JX 645. At this time, Anderson did not know the specific details of the SIFT transaction and had not seen the Commitment Letter. Anderson Tr. 638-39. She did not learn that SIFT Capital or SIFT Fixed were the counterparties until she executed loan agreements on the Company's behalf in late January 2022. *Id.* at 632; Anderson Dep. 120. Even then, she knew "pretty much nothing" about the SIFT entities. Anderson Tr. 634.

[158] On July 16, Italia canceled the Ault letter of intent. JXs 662-63.

[159] Soura Tr. 65.

[160] *Id.* at 65-66.

[161] *Id.*

Consents).[162]  On November 5, Kobeissi sent Soura draft definitive loan materials (the "Loan Materials"), including a "Warrant Agreement."[163]

A few days later, Soura enlisted Joseph Kavan (the Company's transactional and compliance counsel and a partner at Kutak Rock LLP) to lead negotiations.[164] On November 8, Soura shared Kavan's contact information with Kobeissi.[165]  The next day, SIFT Capital's Delaware counsel (Matthews) sent Kavan the Loan Materials.[166]

Negotiations continued over the next month, with Kavan and Matthews exchanging various comments on and revisions to the Loan Materials.[167]  By early December 2021, the Loan Materials reached near-final form.[168]  But the deal was delayed while the parties secured an escrow agent and prepared perfection certificates describing the collateral for the promissory note.[169]

---

[162] JXs 688-99 (Subsidiary Consents for five subsidiaries); *see also* JX 674; Soura Tr. 65-66.

[163] JX 700; JX 703.

[164] JX 709; Soura Tr. 67-68; Soura Dep. 194-95; Italia Tr. 579.

[165] JX 709.

[166] JXs 711-17.

[167] *See* JXs 711-17; JX 720; JXs 726-28; JXs 739-40; JXs 751-52; JX 754.

[168] JX 763.

[169] JX 803; JX 1725; Soura Tr. 72-75; Anderson Tr. 616-17.

## M. The Closing

On January 25, 2022, as authorized by the Commitment Letter, SIFT Capital assigned its rights and obligations to SIFT Fixed US002, LLC.[170] SIFT Fixed is a Delaware limited liability company formed on January 21, 2022.[171] SIFT Master Limited, a Samoan company, is the sole member of and source of funding for SIFT Fixed.[172] SIFT Master has three stockholders, who were existing clients of SIFT Capital and received the investment opportunity directly from SIFT Capital.[173] Issa served as SIFT Fixed's manager until he resigned on November 1, 2022.[174] Issa was replaced by Joseph Sabeh Afaki, who owns a consulting firm specializing in

---

[170] JX 1594. Northern Gold raised an authenticity objection to the assignment agreement (JX 1594), among other documents, under Delaware Rule of Evidence 901. That objection is resolved in Section II.C.1, *infra*.

[171] JX 1595; JX 1704.

[172] JX 1627; JX 1632; JX 1704. There is no evidence that Soura is affiliated with SIFT Capital, SIFT Master, or SIFT Fixed. *See* Soura Tr. 83 (testifying that he has no affiliation with any SIFT entities).

[173] JX 1627; Afaki Tr. 556; Soura Tr. 221-24, 283. To the extent that Northern Gold has raised an authenticity objection to this information, the sources cited in this footnote corroborate that SIFT Master is funded by its shareholders—none of whom are Soura. Northern Gold's overarching authenticity objections are resolved later in this decision. *See* Section II.C.1, *infra*.

[174] JX 1627; JX 1609; JX 1611. Issa's resignation occurred weeks after Northern Gold noticed his deposition. Dkt. 53; JX 1627. Afterward, Northern Gold re-noticed a deposition for Issa and filed a motion to compel it. Dkts. 89, 115. On December 14, 2022, I denied the motion to compel. Dkts. 138, 136.

business development in the Middle East and Southeast Asia.[175] SIFT Capital's Delaware counsel (Matthews) served as counsel for SIFT Fixed.[176]

On January 28, 2022, Matthews circulated Word and PDF versions of the finalized Loan Materials. He asked Kavan that the Company "execute [two] originals of each (except the promissory note - just one) and send them to [his] attention, and send [him] PDFs of all executed documents."[177] Matthews also "asked [his] client [SIFT Fixed] [to] provide [two] originals so that [he could] collate, date, and distribute fully-executed and dated originals to both parties."[178] On January 31, Anderson executed the Loan Materials on behalf of the Company.[179] Issa did the

---

[175] JX 1627; JX 1609; *see* Afaki Tr. 521-22 (testifying about his background). Afaki was contacted about the role by a business acquaintance who asked Afaki if he could manage an investment. Afaki Tr. 522-23. Afaki receives $1,500 in cash per month for his service as the manager of SIFT Fixed. *Id.* at 527 ("[I]n the UAE, it's customary to pay such [small] amounts in cash."). During Afaki's deposition in Wilmington, Delaware, Northern Gold questioned whether Afaki is an actor hired by SIFT Capital to play a role in this litigation. Afaki Dep. 127-28 (Q: "Are you an entertainer?" A: "No, I'm not." "Q: "Are you a performer?" A: "Absolutely not." Q: "Do you have any acting experience?" A: "None."). Afaki—both at his deposition and at trial—gave an unqualified rejection of Northern Gold's suggestion. *See* Afaki Tr. 536 (Q: "Are you a performer, Mr. Afaki?" A. "No, I'm not."); Afaki Dep Tr. 127-28. I do not doubt that Afaki is who he says he is and found his trial testimony to be credible.

[176] *See* JX 1150; JX 860.

[177] JX 823.

[178] *Id.*; *see also* JX 845.

[179] JXs 873-79; Anderson Tr. 616-19; Soura Tr. 73-74. This was the first time that Anderson learned about SIFT Capital or SIFT Fixed. Anderson Tr. 632; Anderson Dep. 120.

same for SIFT Fixed.[180]  The parties sent the executed documents to the escrow agent, Pinnacle Bank.[181]

On February 22, 2022, Pinnacle informed SIFT Fixed and the Company by email that it had received the loan proceeds and executed Loan Materials.[182] Pinnacle attached signature pages to each of the Loan Materials signed by SIFT Fixed and the Company.[183]  This included signature pages to a Loan Agreement in which SIFT Fixed agreed to provide the Company and its related entities with a $10 million loan.[184]  It also included signature pages to the Warrant Agreement, which granted SIFT Fixed a warrant to purchase 2.565 units (or 2.5% of the Company's outstanding units).[185]

---

[180] JXs 1728-32.  Northern Gold's objection challenging the authenticity of the Warrant Agreement (and Loan Materials) is addressed later in this decision.  *See* Section II.C.1, *infra*.

[181] JXs 880-81.  The Company sent the escrow agent its executed documents on February 14.  JX 1107.  SIFT Fixed sent its executed documents a few days later.  *See* JX 1113; JX 1663.

[182] JX 1727; JXs 1728-33.

[183] JXs 1728-33.

[184] JX 1329 (Loan Agreement).

[185] JX 1337 (Warrant Agreement); *see* JX 1388 (Warrant Agreement with a different signature page).  The Loan Materials also included: a Promissory Note in which the Company agreed to pay quarterly interest and to repay SIFT Fixed's loan by February 22, 2025 (JX 1333); an Unconditional Guaranty for the loan between the Company's wholly owned subsidiaries and SIFT Fixed (JX 1335); and a Pledge and Security Agreement granting SIFT Fixed a security interest in its loan (JX 1331).

In that same email, Pinnacle asked the parties to provide joint written notice for "the amount to be distributed and the portion thereof to be deduced from the escrow fund."[186] Later that day, SIFT Fixed and the Company gave Pinnacle written authorization to break escrow.[187] Pinnacle released the Loan Materials and transferred the loan proceeds to the Company's bank account.[188]

### N.    The February 2022 Consent

In late February 2022, Italia and Soura learned that they had "signed the wrong version" of the amended LLC Agreement since it lacked a ROFR provision.[189] Italia asked that the parties execute another amendment to the LLC Agreement with a ROFR. Soura agreed.[190]

On February 25, Soura sent Italia a draft revised LLC Agreement, along with an "associated resolution."[191] Soura's cover email confirmed that the only change to the LLC Agreement related "to the transferability of units" and that "[a]ll prior consents and resolutions remain[ed] effective."[192] The attached LLC Agreement

---

[186] JX 1727.

[187] JX 1150.

[188] JX 1155.

[189] JX 1058; Soura Tr. 83-84, 199; Italia Tr. 361, 442. They made this discovery after Italia requested and received a copy of the May 14 Materials from Company counsel, which he then sent to his own counsel to compare against his files. JX 1269; Italia Tr. 440-41.

[190] Soura Tr. 84-85.

[191] JX 1167; *see* JXs 1168-69.

[192] JX 1167.

included a Schedule A reflecting that Northern Gold and REM OA were both 50% members of the Company.[193]

The "resolution" was a draft written consent of the Company's members dated February 25, 2022 (the "February 2022 Consent").[194]  The document referenced the May 2021 Consent four times.  It confirmed that "any written consent and/or written resolution adopted by [Northern Gold and REM OA] (including, without limitation, the written consent of the Members dated as of May 14, 2021) was validly entered into."[195]  It also "approved, confirmed and ratified . . . any and all actions taken by [the Company] in connection with, related to, or in furtherance of any written consent and/or written resolution," including the May 2021 Consent and "executing any agreements or otherwise entering into any transactions."[196]

On February 28, Italia signed and returned the revised LLC Agreement without changes.[197]  But he told Soura that he needed time to "review the written consent" and would "get back to [Soura] with any proposed changes."[198]  Italia asked

---

[193] JX 1169 at sched. A.

[194] JX 1168.

[195] *Id.* at 2.

[196] *Id.*

[197] JX 1185; *see* JXs 1183-84.  On March 2, Soura circulated a fully executed version of the operative LLC Agreement.  JX 1273 ("Operative LLC Agreement").

[198] JX 1185; *see* JX 1178; Italia Tr. 454, 461.

both Vineberg and a Delaware attorney to review the February 2022 Consent on his behalf.[199]  Italia forwarded the May 14 Materials to his counsel.[200]

After review, Italia asked Soura whether the February 2022 Consent exculpated or released claims against the Company's officers.[201]  On March 2, Soura sent Italia a revised document "with the added language [he and Italia] discussed" and asked Italia to call him with any further concerns.[202]  Satisfied, Italia signed the February 2022 Consent later that day and sent it to Soura.[203]  Soura then circulated executed copies of the revised LLC Agreement and the February 2022 Consent.[204]

## O.    The LaGrange Meeting

While the SIFT transaction was being finalized, Italia was pressing Soura and D'Arcy to facilitate a sale of Italia's equity to the Mechanical and Chemical Industry Corporation ("MKE")—a defense contractor affiliated with the Turkish

---

[199] JX 1191; JX 1196; JX 1229; JX 1264; JX 1269; Italia Tr. 460-62, 480-81.

[200] JX 1229; JX 1269.

[201] JXs 1222-23; Soura Tr. 90-91; Italia Tr. 454-55.  Italia testified that he and his attorneys did not review the "May 14, 2021[] consent" while reviewing the February 2022 Consent. Italia Tr. 459.  But Northern Gold's privilege log reflects that on March 2, Italia and his attorneys had a privileged discussion about the "May 14 Subsidiary Consents."  JX 1598, Entry 103.

[202] JXs 1222-23.

[203] JX 1270 ("[H]ere u go[.]"); JX 1271.

[204] JXs 1272-74.

government.[205]  The deal crystallized in late January 2022 when MKE submitted a letter of intent to acquire 20% of the Company for $60 to $65 million.[206]

The offer raised red flags for D'Arcy.[207]  Just six months earlier, Ault had valued the Company at roughly $38 million.[208]  By contrast, MKE's bid valued the Company at approximately $300 to $325 million.  The Company's officers and counsel were also concerned by Italia's diligence requests.[209]

On March 8, 2022, Soura, Italia, and MKE's counsel met in LaGrange, Georgia to discuss the MKE deal and visit the Company's new manufacturing facility.[210]  Soura recorded their conversation—unbeknownst to the other participants.[211]  The recording includes suggestions that the deal was a "kickback"

---

[205] Soura Tr. 100-01.

[206] JXs 901-02.

[207] D'Arcy Tr. 587-90 (expressing concern about sharing diligence information with a foreign firearms manufacturer); *see also* Soura Tr. 101-03; Italia Tr. 498-500.

[208] *See* JX 655.

[209] D'Arcy Tr. 586-89; JX 1311; JX 1324; JX 1342; *see also* Soura Tr. 103-04.

[210] Soura Tr. 104-06; Italia Tr. 371-72, 500-01.

[211] Soura Tr. 104-05; Italia Tr. 501; JXs 1618-19; JX 1681.  Northern Gold objected to the introduction of a transcription of the recorded conversation based on the best evidence rule. Italia Tr. 504-05; *see* D.R.E. 1002.  Having reviewed the relevant portions of the transcription and the recorded conversation, I find the transcription to be accurate.  JX 1681 at 2-3; *id.* at 1-2; *see Atkins v. State*, 523 A.2d 539, 544-45 (Del. 1987) ("When original tape recordings are properly introduced into evidence, transcriptions of those recordings may also be received into evidence with the exercise of judicial discretion.").

scheme based on a purposefully inflated valuation.[212]   At trial, Italia adamantly denied making these statements.[213]

### P.    The Warrant Exercise

After the meeting in LaGrange, Soura relayed the discussion about the potential MKE transaction to D'Arcy and SIFT Fixed's representatives (Kobeissi and Issa).[214]   Soura also reported that Italia had taken firearms, ammunition, and other Company property worth millions of dollars.[215]   Issa told Soura that SIFT Fixed intended to exercise its warrant.[216]

---

[212] JX 1681 at 2; *see also id.* at 3, 5, 8, 97-98, 129, 162.  I consider this discussion only insofar as it provides context for SIFT Fixed's subsequent exercise of its warrant and bears on witness credibility.  I make no assessment of the discussed matters beyond that and am not finding that a kickback scheme was hatched.

[213] Italia Tr. 502-04.

[214] Soura Tr. 107-09; Afaki Tr. 549; D'Arcy Tr. 590.  Northern Gold raised a standing objection to hearsay insofar as Afaki testified about what Issa told him.  *See* Afaki Tr. 543. Afaki testified about Issa's then-present intention to exercise the warrant.  *Id.* at 549.  This testimony is admissible on that basis under Delaware Rule of Evidence 803(3).  *See supra* note 80.

[215] JXs 97-98; JX 143; JX 156; JX 196; JXs 212-14; JX 121; JX 151; JX 393; JX 1452; JX 1457; JX 1911; D'Arcy Tr. 590-91 (discussing artwork, ammunition, machine guns, a truck, and other firearms that "went missing"); Soura Tr. 98.  I make no finding on whether Italia did, in fact, engage in this conduct.  *See* Italia Tr. 348-49 (describing taking 47 guns for himself that were "all registered," "documented," and "lawfully transferred").   I consider it only as relevant context for SIFT Fixed's exercise its warrant and witness credibility.

[216] Soura Tr. 111-13.  Northern Gold objected to Soura's testimony about what Issa said on hearsay grounds.  Soura's testimony is admissible as a statement of Issa's then-present intent under Delaware Rule of Evidence 803(3).  *See supra* notes 80, 214.

On March 21, 2022, Issa executed a Notice of Exercise on behalf of SIFT Fixed.[217] Soura testified that he received the Notice of Exercise through the SIFT Capital data room.[218] On March 22, Soura updated Schedule A of the operative LLC Agreement to reflect the issuance of units to SIFT Fixed, listing SIFT Fixed as a 2.5% member of the Company.[219] Soura did not send the updated Schedule A to anyone at that time.[220]

## Q.    The Dallas Meeting

On March 31, 2022, Italia, Soura, and D'Arcy met at the Dallas airport to discuss the potential MKE transaction and corporate governance issues.[221] By this point, Italia and Soura's relationship had soured and D'Arcy acted as an intermediary.[222] The meeting began with Soura telling Italia that he would not

---

[217] JX 1648; Soura Tr. 114-15; JX 1400. According to Northern Gold, JX 1400 "has a document metadata date of April 20, 2022." Def's Answering Br. 28.

[218] Soura Tr. 114-15. To the extent that there is contradictory evidence about how Soura received the Notice of Exercise, Soura's testimony that he received the document through the data room was more credible when placed in context of the overall record. *Cf.* Soura Dep. 250, 467-70, 493-94; Soura Tr. 255, 267-69; JX 1685; JX 1476.

[219] JX 1455 at sched. A; JX 1424 at sched. A. According to Northern Gold, the document metadata date for JX 1424 is March 22, 2022. Def's Answering Br. 35.

[220] *Cf. infra* note 233 and accompanying text.

[221] D'Arcy Tr. 593-94; Italia Tr. 364-65; Soura Tr. 116-17.

[222] D'Arcy Tr. 593.

support the MKE deal.[223]  Soura also raised the SIFT transaction and explained that

SIFT Fixed had exercised its warrant.[224]

After the Dallas meeting, on April 4, Italia emailed D'Arcy to express his

"surprise" that the Company had "taken a loan from an offshore entity in Hong

Kong."[225]  Italia requested documentation on the SIFT transaction and asked D'Arcy

to forward him the "loan documents."[226]  That afternoon, D'Arcy sent Italia the Loan

Materials, including the Warrant Agreement.[227]  D'Arcy did not include the

Commitment Letter.[228]

### R.      The Books and Records Action

The next day, Northern Gold filed a books and records action in this court,

seeking documents pertaining to the Commitment Letter, the May 2021 Consent,

---

[223] *Id.* at 593-94.

[224] *Id.* (testifying that Soura brought the "loan agreement" to the meeting and "Italia said he had never seen these, never agreed with them"); Soura Tr. 118-19.  Italia testified that he learned about the $10 million loan from SIFT at the meeting.  Italia Tr. 365-66.  But he denied that Soura told him about the warrant.  Italia Tr. 368, 513-16.  His denial is, however, contradicted by Northern Gold's own filings in this court stating that Italia learned about the warrant during the March 31 meeting.  JX 1552 ¶ 50; JX 1723 at 21; *see* Italia Tr. 516-20.  Italia testified that Northern Gold's submissions were inaccurate and that he had not reviewed them before filing, despite having testified otherwise during his deposition.  Italia Tr. 516-20; Italia Dep. 46.  Given these inconsistencies and the other evidence, it seems more likely than not that Italia learned about the warrant during the Dallas meeting.

[225] JX 1382.

[226] *Id.*

[227] JXs 1389-94.

[228] JXs 1389-94.

SIFT Capital, and SIFT Fixed.[229]  On April 21, Soura emailed Company counsel at Richards, Layton & Finger, P.A. ("RLF") a "complete set" of "the corporate documents and loan documents for REM EQ and [its] subsidiaries."[230]  The documents included the Commitment Letter, the Warrant Agreement, and the Notice of Exercise.[231]

On May 9, RLF informed Northern Gold that SIFT Fixed had executed its warrant, was a member of the Company, and was a party to the LLC Agreement.[232] RLF also attached a copy of the revised Schedule A to the LLC Agreement reflecting SIFT Fixed's membership in the Company.[233]

### S.    This Litigation

This action was commenced by plaintiffs REM OA and SIFT Fixed on June 30, 2022.[234]  The plaintiffs seek a declaration under 6 *Del. C.* § 18-110 that (at

---

[229] *N. Gold Hldgs., LLC v. Rem EQ Hldgs., LLC*, 2022 WL 17338787, ¶¶ 1.j-l (Del. Ch. Nov. 23, 2022).  A paper trial was held in the books and records action on September 20, 2022, and I issued a bench ruling on October 10.  *See infra* note 390.  A final order and judgment was entered on November 23, 2022.  C.A. No. 2022-0308-LWW (Del. Ch. Nov. 23, 2022) (ORDER).

[230] JX 1401.

[231] JX 1446; JX 1451; JX 1419.  Northern Gold raised an authenticity objection to various versions of the Commitment Letter (e.g., JX 1446), among other documents, under Delaware Rule of Evidence 901.  That objection is resolved in Section II.C.1, *infra*.

[232] JX 1907.  There is no evidence that SIFT Fixed executed a joinder to the LLC Agreement.

[233] JX 1909.

[234] Dkt. 1.

the time the action was filed) SIFT Fixed was a 2.5% member of the Company, and Northern Gold and REM OA were 48.75% members.[235] The plaintiffs also seek an award of fees and costs.[236]

On August 1, Northern Gold filed a counterclaim seeking declarations that the warrant and units issued to SIFT Fixed were unauthorized and invalid, that SIFT Fixed is not a member of the Company, and that Northern Gold owns 50% of the Company's units.[237]

On August 5, I entered an order to maintain the status quo during the pendency of the litigation.[238] On November 3, Northern Gold moved to enforce the status quo order to prevent the Company's proposed $5 million capital raise through a pro rata equity issuance (the "Capital Raise").[239] The Company asserted that additional capital was urgently needed to fund the Company's relocation to Georgia.[240] Given the Company's professed financial straits, I declined to bar it from proceeding with the Capital Raise. I did so provided that while the status quo order remained in

---

[235] Compl. ¶¶ 61-64.

[236] *Id.* ¶¶ 69-72.

[237] Answer and Countercl. ¶¶ 111-20.

[238] Dkt. 29.

[239] Dkt. 59. The Company proposed issuing 20.51 membership units pro rata to SIFT Fixed, REM OA, and Northern Gold. If a member chose not to participate, a participating member could buy the unpurchased units. Dkt. 59 Ex. B.

[240] Dkts. 72, 75. The plaintiffs supported the Company's position.

place, no redemption of units would occur and no single member of the Company would be deemed to control more than 50% of the Company's units.[241] Northern Gold was free to take part in the Capital Raise.

Subsequently, REM OA and SIFT Fixed subscribed to the Capital Raise.[242] After Northern Gold declined to participate, REM OA purchased the units Northern Gold passed on.[243] On December 6, Anderson circulated an updated capitalization table for the Company with the following ownership breakdown: REM OA, 56.8737%; Northern Gold, 40.6256%; and SIFT Fixed, 2.5007%.[244]

A two-day trial was held on January 24 and 25, 2023.[245] Post-trial briefing followed, and a post-trial argument was held on May 10, 2023.[246] After additional

---

[241] Dkts. 106-07.

[242] JXs 1616-17; JXs 1620-22. Northern Gold raised a relevance objection to these exhibits (as well as JXs 1623-24 and JX 1626) under Delaware Rule of Evidence 401. The documents are relevant to my description of the procedural history of this matter.

[243] JXs 1623-24; *see supra* note 242 (discussing relevance).

[244] JX 1626; *see supra* note 242 (discussing relevance). As I explained during the January 17, 2023 pre-trial conference, the merits of this equity issuance were not a topic for trial. Dkt. 172 at 27. I have made no findings of fact about the propriety or effectiveness of the Capital Raise. I am describing the Capital Raise as part of the procedural background leading up to trial and to provide context for the declaratory relief entered after trial.

[245] Dkts. 171, 174-75. On the eve of trial, the plaintiffs filed a motion in limine to allow Jade Kobeissi to testify remotely despite his repeated refusals to sit for a deposition. Dkt. 154. I denied the plaintiffs' motion as prejudicial to Northern Gold. Dkt. 172, 171, 162.

[246] Dkts. 189, 196. After trial, the Company submitted a letter outlining its position that it complied with certain federal regulations. Dkt. 178. I have not considered the Company's assertions when determining whether the plaintiffs met their burden at trial.

submissions regarding metadata, the matter was taken under advisement on June 20, 2023.[247]

## II. LEGAL ANALYSIS

Under 6 *Del. C.* § 18-110, this court is authorized "to determine the membership interest in a limited liability company.[248] "The parties have the burden of proving their respective claims by a preponderance of the evidence."[249] The plaintiffs have done so. Northern Gold has not.

Northern Gold authorized the Commitment Letter and SIFT transaction when it signed the May 2021 Consent after weeks of review and advice from counsel. It provided further authorization through the February 2022 Consent. Although Northern Gold lacked actual knowledge of the transaction's terms, it could have learned them through basic diligence. None of Northern Gold's challenges invalidate its consent, the SIFT transaction, or the admittance of SIFT Fixed as a member of the Company.

---

[247] Dkt. 197. The parties also submitted letters on metadata associated with certain exhibits. Dkts. 190-95; *see supra* note 66.

[248] 6 *Del. C.* § 18-110.

[249] *Lynch v. Gonzalez*, 2020 WL 4381604, at *30 (Del. Ch. July 31, 2020), *aff'd*, 253 A.3d 556 (Del. 2021); *see also In re IAC/InterActiv Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008) ("[T]he plaintiff in the [18-110] Action[ ] bears the burden of proving by a preponderance of the evidence that it is entitled to relief.").

## A. Whether Northern Gold Authorized the SIFT Transaction

The LLC Agreement requires that the Company's "Members" authorize the issuance of units and warrants.[250] The "Members" are those "holding, in the aggregate, a majority of more of the total issued and outstanding Units."[251] Because neither Northern Gold nor REM OA held more than 50% of the units, they were both required to consent to the Company's execution of the Commitment Letter and the issuance of the warrant to SIFT Fixed.

The LLC Agreement permits the members to act by written consent.[252] The May 2021 Consent was signed by REM OA and Northern Gold.[253] They expressly

---

[250] LLC Agreement § 3.1(A) (stating that the "Members" "shall have the authority in their sole and absolute discretion . . . to issue Units . . . and to cause the Company to issue warrants, options or other instruments relating to Units"); Operative LLC Agreement § 3.1(D); Operative LLC Agreement § 3.2(A); *see also* Operative LLC Agreement § 4.1(A); *infra* notes 365-68, 383-84 and accompanying text.

[251] Operative LLC Agreement at sched. 1.1; *see id.* ("Unit: shall mean the ownership interest of a Member in the Company at any particular time, including the Member's share of the profits and losses of the Company, the right to receive distributions from the Company and the right to any and all other benefits to which such Member may be entitled as provided in this Agreement and in the LLC Act, together with the obligations of such Member to comply with all the terms and provisions of this Agreement and of the LLC Act. The Units owned by a Member shall represent such Member's entire interest in the Company, and a Member will automatically cease to be a member of the Company when they no longer own any Units (whether by sale, assignment, redemption or otherwise)."). I note that the LLC Agreement as revised on March 22, 2022 is identical to the version revised in February 2021, except for Soura's updates to Schedule A. *See* JX 1455. Other than the changes to Schedule A, the relevant material provisions of the LLC Agreement are not in dispute. *See* Defs.' Answering Br. 35-36.

[252] Operative LLC Agreement § 4.1(A); *see infra* note 382 and accompanying text.

[253] Italia's knowledge and actions are imputed to Northern Gold, just as Soura's are imputed to REM OA. *See In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009)

45

granted "any Member or Officer, acting alone" the authority to execute the Commitment Letter "without any further act, vote or approval."[254] Thus, Soura's execution of the Commitment Letter was authorized by the Company's members.

The members also authorized the Company's entry into the Loan Materials (including the Warrant Agreement). The May 2021 Consent provided that "any Member or Officer" was "fully authorized to execute and deliver" and to cause the Company "to perform its obligations under . . . all documents relating [to] or contemplated [by]" the Commitment Letter.[255] The final Loan Materials relate to and are contemplated by the Commitment Letter. They conformed to the Commitment Letter's key business terms, including that SIFT Capital or its designee would receive a warrant for 2.5% of the Company's outstanding equity.[256]

---

("[T]he knowledge of an agent is normally imputed to the agent's principal."), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011); *Cuppels v. Mountaire Corp.*, 2020 WL 3414848, at \*6 (Del. Super. June 18, 2020) ("[U]nder standard principles of agency law, [the agent's] actions may be imputed to [the principal].").

[254] May 2021 Consent at 2; *see also* JX 526; JX 583; JX 587; JX 590; JX 596; Italia Tr. 399, 401-02; Operative LLC Agreement at sched. 1.1 ("Member: means REM OA HOLDINGS, LLC and NORTHERN GOLD HOLDINGS, LLC, as the initial members of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement . . . or other agreement authorized by the Members . . . .").

[255] May 2021 Consent at 2.

[256] *Compare* JX 210 *with* JX 1391 at 2 *and* JX 1394 at 1; *see also infra* notes 346-53; *infra* Section II.C.1 (resolving Northern Gold's authenticity challenges, including to JX 1391). Moreover, the "Member or Officer" was permitted to finalize the documents "with such changes . . . deem[ed] in his [or her] sole discretion advantageous to the Company, all

46

Northern Gold and REM OA further authorized the Commitment Letter and Loan Materials when they executed the February 2022 Consent. They affirmed that the May 2021 Consent "was validly entered into" and a "binding agreement enforceable against" each member, ratified actions previously taken pursuant to the May 2021 Consent, and authorized "any Member, Officer or other agent of the Company . . . to continue to take any and all actions . . . in furtherance of" the May 2021 Consent.[257]

Delaware is a "contractarian" state.[258] Our law recognizes that "parties have a right to enter into good and bad contracts" and "enforces both."[259] "As a matter of ordinary course, parties who sign contracts and other binding documents, or authorize someone else to execute those documents on their behalf, are bound by the obligations that those documents contain."[260] "The presumption that the parties are bound by the language of the agreement" they signed "applies with even greater force when the parties are sophisticated" and "engaged in arms-length

without any further act, vote or approval of any Member, Officer or other person or entity." May 2021 Consent at 2.

[257] JX 1274 at 2.

[258] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011) (explaining that Delaware "is more contractarian than . . . many other states").

[259] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[260] *Off. Comm. of Unsecured Creds. of Motors Liquid. Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1015 (Del. 2014).

negotiations."[261] This presumption is particularly strong when sophisticated parties are represented by counsel.[262]

Italia is a sophisticated businessperson. He founded, ran, and sold two businesses for substantial profits.[263] He was advised by counsel in negotiating and executing the May 2021 Consent—the same counsel who has represented him in "dozens" of corporate transactions.[264] He was represented by counsel again in connection with the February 2022 Consent, even negotiating for the inclusion of a provision.[265] He is presumptively held to his agreements.

## B.    Whether Northern Gold's Authorization Is Valid

Northern Gold avers that it should not be bound by the May 2021 Consent (and the agreements it authorized) for numerous reasons. These include that: (1) Northern Gold was not given a copy of the Commitment Letter to approve; (2) Northern Gold was mistaken or misled about the terms of the SIFT transaction; and (3) information about the dilutive terms of the SIFT transaction was withheld

[261] *W. Willow-Bay Ct., LLC v. Robino–Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009).

[262] *See Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *4 (Del. Ch. Apr. 27, 2004), *aff'd*, 864 A.2d 929 (Del. 2004); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001).

[263] *E.g.*, Italia Tr. 463.

[264] *Id.* at 383.

[265] JX 1274.

from Northern Gold by REM OA. None of these arguments invalidate Northern Gold's authorization.

### 1. Ignorance of the Commitment Letter's Terms

The plaintiffs did not prove that Northern Gold was shown the Commitment Letter before Italia signed the May 2021 Consent.[266] But Italia was admittedly aware that he was signing a document authorizing a Commitment Letter for SIFT Fixed to provide a $10 million loan to the Company.[267] Even if he were not, a review of the May 2021 Consent would have made it obvious. The May 2021 Consent emphasized and repeatedly mentioned the Commitment Letter.[268]

A contracting party must "stand by the words of his contract."[269] Avoidance is not justified by "a party's failure to read a contract" or insistence that she "had not been informed of [its] stated terms."[270] This is especially so where the contracting

---

[266] *See supra* note 101 and accompanying text (finding that Italia was not given a copy of the Commitment Letter during the Ilion meeting). They also did not prove that Italia received a copy before he signed the February 2022 Consent.

[267] Italia Tr. 356-57, 388; *see supra* notes 120-21 and accompanying text (finding that Italia saw references to and formed an impression of the Commitment Letter when he reviewed the May 2021 Consent); May 2021 Consent at 1-2.

[268] *See supra* note 117 and accompanying text (discussing the repeated mentions and emphases of the Commitment Letter in the May 2021 Consent).

[269] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991).

[270] *Id.*; *see also Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989) ("[A] party's failure to read a contract [cannot] justify its avoidance."); *Moore v. O'Connor*, 2006 WL 2442027, at *4 (Del. Super. Aug. 23, 2006) ("One of the basic tenets of contract law is that a party is responsible for the terms of a contract they sign, even if unaware of the terms."); *Harrington Raceway, Inc. v. Vautrin*, 2001 WL 1456873, at *3

party is a sophisticated businessperson represented by counsel.[271]  Italia and his lawyers—who spent weeks reviewing the May 14 Materials—had ample opportunity to ask about the Commitment Letter.  Their failure to do so cannot vitiate Northern Gold's written assent.[272]

The fact that the warrant was unmentioned in the May 2021 Consent does not require a different outcome.[273]  The May 2021 Consent referenced the Commitment Letter that, in turn, addressed the warrant.  "The obligation of a contracting party to read any contract it signs extends to documents incorporated by reference, which become part of the terms of the parties' agreement at the time of execution."[274]

---

(Del. Super. Aug. 31, 2001) ("[T]he Court cannot protect business people who decide to sign contracts . . . without reading them.").

[271] *Braga Inv. & Advisory, LLC v. Yenni*, 2023 WL 3736879, at *14 (Del. Ch. May 31, 2023) (explaining that "a sophisticated investor, cannot rely on its own failure to request and read [an agreement] as grounds to rescind . . . or to invalidate" the agreement).

[272] *See McAnulla Elect. Const., Inc. v. Radius Techs., LLC*, 2010 WL 3792129, at *1 (Del. Super. Sept. 24, 2010).

[273] *See* Def.'s Answering Br. 39-40.

[274] *McAnulla*, 2010 WL 3792129, at *4 (rejecting the plaintiff's argument that it was not bound by a contract incorporated by reference into its agreement with the defendant because the plaintiff was never given the referenced contract); *see also Rose Heart, Inc. v. Ramesh C. Batta Assocs., P.A.*, 1994 WL 164581 (Del. Super. Apr. 12, 1994).  Northern Gold tries to distinguish *McAnulla* because the agreement at issue there was a single page in length.  Def.'s Answering Br. 46.  This argument is unavailing.  None of the written consents referencing the Commitment Letter exceeded two and a half pages.  *See* May 2021 Consent; JX 526; JX 583; JX 587; JX 590; JX 596; JX 599; *see also RHA Constr., Inc. v. Scott Eng'g, Inc.*, 2013 WL 3884937, at *7 (Del. Super. July 24, 2013) (holding that a separate document not provided at the time of execution was incorporated into an enforceable contract where the contract was ten pages long and the separate document was referenced on the ninth page).

Northern Gold "bore responsibility for making further inquiries before it agreed to assume obligations defined in a separate document."[275] It chose not to inquire.

### 2. Mistake or Fraud

Northern Gold suggests that its authorization of the Commitment Letter was ineffective because Soura and Company counsel led it to believe that the May 2021 Consent preserved Northern Gold's 50% membership interest.[276] Insofar as this argument invokes the doctrines of mistake or fraudulent inducement, neither applies.[277]

---

[275] *McAnulla*, 2010 WL 3792129, at *4.

[276] Def.'s Answering Br. 40-42. Northern Gold also suggests that its authorization of the Commitment Letter in the May 2021 Consent is ineffective because there is "no evidence of a meeting of the minds for Northern Gold to give away its valuable 50% interest in the Company for no consideration and for Soura to acquire a controlling interest in the Company (with SIFT [Fixed]) for no consideration." *Id.* at 42. Setting aside that Soura did not obtain a controlling interest, Northern Gold's argument falls apart in view of Italia's decision to execute the May 14 Materials. By signing the materials, his "mutual assent to the exchange and consideration" was manifested. *United Health All, LLC v. United Med., LLC*, 2013 WL 6383026, at *6 (Del. Ch. Nov. 27, 2013). Further, the $10 million loan provided consideration to the Company, whose benefit was indirectly shared with Northern Gold. *See Agostino v. Hicks*, 845 A.2d 1110, 1124 (Del. Ch. 2004) (observing that "warrants were issued as partial consideration for providing [a loan] to [the company] (the benefits of which were indirectly shared by plaintiff)").

[277] Northern Gold does not expressly invoke either of these doctrines. Instead, it cites to various cases involving unrelated legal principles. Def.'s Answering Br. 41. The plaintiffs (fairly) interpreted Northern Gold's disjointed arguments as raising theories of fraudulent inducement or mistake. *See* Pls.' Post-trial Reply Br. (Dkt. 186) 6-8. I have therefore considered the doctrines and whether they bear on my conclusion that Northern Gold authorized the Commitment Letter and SIFT transaction by signing the May 2021 Consent. Insofar as Northern Gold is invoking the doctrines, both unilateral mistake and fraudulent inducement must be proven by the party seeking to void the contract. *See FdG Logistics*

51

Under Delaware law, recission of a contract due to unilateral mistake is only available when a party can demonstrate that "the mistake occurred regardless of the exercise of ordinary care."[278] As discussed, Northern Gold could have discovered the warrant by exercising ordinary care: requesting and reviewing the Commitment Letter referenced in the May 2021 Consent.[279] A party is not excused from its obligations because it "was mistaken as to the legal effect of his contract."[280]

Fraudulent inducement is likewise "not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation."[281] Italia had known since January 2021 that Soura was looking

---

*LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 861 (Del. Ch. Feb. 23, 2016), *aff'd*, 148 A.3d 1171 (Del. 2016); *Braga Inv.*, 2023 WL 3736879, at *10.

[278] *FdG Logistics*, 131 A.3d at 861 (citation omitted).

[279] *W. Willow-Bay*, 2009 WL 3247992, at *4 n.19 (Del. Ch. Oct. 6, 2009) ("'[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.'" (quoting 27 Williston on Contracts § 70.113 (4th ed. 2009))), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE); *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) (explaining that a unilateral mistake must have "occurred regardless of the exercise of ordinary care").

[280] *Shah v. Shah*, 1988 WL 67403, at *4 (Del. Ch. June 28, 1988).

[281] *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006) (citing 17A Am. Jur. 2d Contracts § 214 (2006)), *aff'd*, 933 A.2d 1249 (Del. 2007); *see also Snyder v. Jehovah's Witnesses, Inc.*, 2005 WL 2840285, at *3 (Del. Super. Oct. 28, 2005) (holding that reliance was not justifiable where the party "had both the awareness and the opportunity to discover the accurate information . . . but chose not to"); *Hollinger Int'l v. Black*, 844 A.2d 1022, 1065-66 n.95 (Del. Ch. 2004) ("Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.").

to raise funds by offering a "a non-controlling stake."[282]   When Italia  saw the references to the Commitment Letter in the May 2021 Consent, he knew they concerned a loan from SIFT Capital.[283]   He opted not to investigate.[284]   Instead, Northern Gold executed multiple written consents authorizing the Commitment Letter.[285]

### 3. Breach of Fiduciary Duty

Northern Gold also contends that its consent is negated by "REM OA's violation of its fiduciary duty of disclosure" regarding the Commitment Letter.[286] REM OA did not, however, owe fiduciary duties to Northern Gold.

Section 4.1(A) of the LLC Agreement provides that the Company's management rests with the "Members" (i.e., a majority of the members).[287]   Section 4.4(B) states that "[e]xcept as otherwise provided herein . . . each Member shall have

---

[282] *See supra* note 36 and accompanying text.

[283] *See* Italia Tr. 356-57; *supra* notes 120-21 and accompanying text.

[284] *See Carrow*, 2006 WL 3289582, at *1 (concluding that a party had not proven fraudulent inducement where the party reviewed the contract, saw the allegedly fraudulent terms, and failed to investigate); *Arwood v. AW Site Services, LLC*, 2022 WL 705841, at *25 (Del. Ch. Mar. 9, 2022) (rejecting a fraud claim where the plaintiffs saw evidence of the fraud and were recklessly indifferent to the truth).

[285] As such, Northern Gold's authorization was neither "silent" nor given by "acquiesce[nce]."  Def.'s Answering Br. 42.

[286] *Id.*

[287] Operative LLC Agreement § 4.1(A).

the default fiduciary duties provided by applicable law."[288]  But "only managing members or controllers owe fiduciary duties by default in LLCs."[289]  REM OA was neither.[290]  The LLC Agreement does not impose any additional, non-default fiduciary duties on REM OA.[291]

## C.    Whether the Relevant Agreements Are Valid

Next, Northern Gold asserts that the agreements effectuating the SIFT transaction are invalid.[292]  It makes two main arguments.  First, that the Commitment Letter, Loan Materials, and Notice of Exercise are inauthentic or forged.  And

---

[288] *Id.* § 4.4(B).  Section 4.4(B) waives the fiduciary duties of majority Members: "To the fullest extent permitted by law, the Members, when acting pursuant to the authority given to them in this Agreement, shall not have any fiduciary duties to any other Member or any other Person bound by this Agreement."  *Id.*

[289] *Beach to Bay Real Est. Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017, revised July 11, 2017) (holding that minority members of Delaware LLCs do not owe default fiduciary duties).  The only case Northern Gold cites to argue otherwise addresses the availability of *Corwin* ratification.  *See* Def.'s Answering Br. 42.

[290] REM OA owned 50% of the Company.  The Company was managed by the "Members," meaning a majority.  JX 1424 at sched. 1.1.

[291] Even if REM OA owed a fiduciary duty to Northern Gold, Northern Gold had the means to evaluate the decision presented to it.  *See Dohmen v. Goodman*, 234 A.3d 1161, 1171 (Del. 2020) (stating that where the company asks a stockholder to enter into an individual transaction, the stockholder "may refuse to do so until he is satisfied the [company] has given him sufficient information to evaluate the decision presented to him") (citing *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009)).

[292] These arguments are made in a section of Northern Gold's post-trial brief called "The Plaintiffs Have Not Met Their Burden to Prove the Validity of the 'Warrant' or that a Valid Contract Exists Between the Company and SIFT002 Making SIFT002 a Tie-Breaking Member in the Company."  Def.'s Answering Br. 55.  Sub-arguments made in this section overlap with others I have addressed elsewhere.  I have endeavored to avoid duplication where possible.

54

second, that the plaintiffs did not prove that the Warrant Agreement is an enforceable contract. The Warrant Agreement and related documents are authentic and credible evidence. The Warrant Agreement is also enforceable.

### 1. Authenticity

Northern Gold contends that the plaintiffs failed to prove the authenticity of the Commitment Letter, Warrant Agreement, and Notice of Exercise.[293] It asserts that the signatories for SIFT Capital and SIFT Fixed—Zhang and Issa—are imaginary and that their signatures are "forger[ies]."[294] These arguments are without factual or legal support.

Under Rule 901 of the Delaware Rules of Evidence, authentication requires "evidence sufficient to support a finding that the item is what the proponent claims it is."[295] This "lenient burden" is "easily met."[296] "The proponent need not conclusively prove the evidence's authenticity, but merely provide a 'rational basis'

---

[293] Def.'s Answering Br. 56-65.

[294] *Id.* at 61, 63, 76. Northern Gold bears the burden of proving that the documents are forgeries. *See Clymer v. DeGirolano*, 2021 WL 2181377, at *4 (Del. Ch. May 27, 2021) ("The weight of authority in Delaware indicates that the [party seeking to invalidate the contract] bear the burden of proving that [the] signature was forged."); *see also Matter of Doris J. Foster Inter Vivos Declaration of Tr.*, 2022 WL 17091972, at *3 n.35 (Del. Ch. Nov. 21, 2022) ("To the extent that [the party] contends that the signature was forged, [that party] bears the burden of proof.").

[295] D.R.E. 901(a).

[296] *Schaffer v. State*, 2018 WL 1747793, at *5 (Del. 2018).

from which a reasonable finder of fact could draw that conclusion."[297]   Means to

authenticate are flexible and include "witness testimony, corroborative

circumstances, distinctive characteristics, or other evidence probative of

authenticity."[298]

The authenticity inquiry under Rule 901 is distinct from the question of

whether a document is a forgery.  Authenticity is the threshold matter.[299]   Once the

court is satisfied that the requirements of Rule 901 are met, the factfinder must

determine whether the admitted evidence is credible.[300]   The record provides a

sufficient evidentiary basis to authenticate the various agreements with SIFT

entities.  I reject Northern Gold's contentions that the documents are fake or forged.

---

[297] *Id.*; *see United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013) (explaining that the federal counterpart of D.R.E. 901 requires "a prima facie showing of some competent evidence to support authentication").  Delaware Rule of Evidence 901 tracks Federal Rule of Evidence 901, and federal decisions are highly persuasive authority on the former.  *See Dawson v. Pittco Cap. P'rs, L.P.*, 2010 WL 692385, at *1 n.3 (Del. Ch. Feb. 15, 2010).

[298] *Schaffer*, 2018 WL 1747793, at *5 (citation omitted).

[299] *Parker v. State*, 85 A.3d 682, 687-88 (Del. 2014) ("Where a proponent seeks to introduce [] evidence, he or she may use any form of verification available under Rule 901 . . . . [T]he trial judge as the gatekeeper of evidence may admit the [evidence] when there is evidence 'sufficient to support a finding' by a reasonable juror that the proffered evidence is what its proponent claims it to be. . . . If the Judge answers that question in the affirmative, the jury will then decide whether to accept or reject the evidence."); *see United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985) ("The question of authenticity is left to the discretion of the trial judge [under F.R.E. 901].").

[300] *See United States v. Aldaco-Lopez*, 956 F.2d 1168, 1168 (9th Cir. 1992) ("Once the [proponent] meets this burden [under F.R.E. 901], the probative force of the evidence is an issue for the jury."); *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013) (same).

### a. Zhang and Issa

Northern Gold's attacks on the documents' authenticity stem from its insistence that Zhang and Issa do not "even exist."[301] Although neither Zhang nor Issa testified in this action, there is ample evidence confirming their existences and roles at SIFT Capital and SIFT Fixed, respectively.[302] Soura, D'Arcy, and Anderson each had multiple conversations with Issa;[303] Afaki met him in person.[304] There is documentary evidence that SIFT Fixed's Delaware counsel (Matthews) worked with Issa to obtain his signature for the loan documents.[305] Regarding Zhang, Soura testified to numerous conversations with him.[306] Self-authenticating filings with the Securities and Exchange Commission further confirm Zhang's background and role at SIFT Capital.[307]

---

[301] Def's Answering Br. 61-67.

[302] *See Castro v. State*, 266 A.3d 201, 206 n.14 (Del. 2021) ("The law makes no distinction between direct and circumstantial evidence."). Northern Gold sought to compel the depositions of Zhang and Issa. Dkt. 115. I denied this motion because both were foreign citizens and neither was then a director, officer, managing agent, or employee of SIFT Fixed. *See* Dkt. 145.

[303] Soura Tr. 65-66, 77-78, 110-11; D'Arcy Tr. 581; Anderson Tr. 621-22 (describing a Teams meeting with Issa); JX 1587; JX 1477 (meeting invite with Anderson, Soura, D'Arcy, and Issa); JX 1479; JX 1485; JX 1487.

[304] Afaki Tr. 537.

[305] JXs 711-17; JXs 719-20; JX 727; JXs 739-40; JXs 751-52; JX 754; JXs 873-79; Anderson Tr. 616, 618-19; Soura Tr. 69-70, 73-74, 76-77, 80; JXs 880-81; JX 1133; JXs 1150-53.

[306] Soura Tr. 23-24, 27, 66.

[307] *E.g.*, JX 1679 at 8.

b.     The Commitment Letter

Circumstantial evidence provides adequate grounds to authenticate the Commitment Letter and reject the argument that it was forged. At trial, Soura testified to conversations with Zhang about terms of the SIFT transaction that were later documented in the Commitment Letter.[308] He explained that drafts of the term sheet portion of the Commitment Letter were exchanged through the data room.[309] Soura credibly testified that the data room was controlled by SIFT Capital on its eponymous website and bore SIFT Capital's unique logo.[310] The Commitment

___

[308] Soura Tr. 23-24, 27, 66.

[309] *Id.* at 255-56; Soura Dep. 492-93. Because few documents from the data room were produced in this litigation, Northern Gold also seeks an adverse inference against the plaintiffs "that the documents that were purged from the data room would have demonstrated that [SIFT Fixed] is not a valid member of the Company." Def.'s Answering Br. 103. I decline to grant this adverse inference given the lack of evidence that the plaintiffs "intentionally or recklessly destroy[ed] evidence." *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006); *cf. Braga Inv.*, 2023 WL 3736879, at *7 (noting that "[t]he only documentary evidence of the contents of the data room is a screenshot of an automated email sent from the data room service provider to [the defendant]"). An adverse inference is also inappropriate because *any* evidence from the data room would presumably aid the plaintiffs' case. *See Stern v. Shammas*, 2015 WL 4530473, at *14 (E.D.N.Y. July 27, 2015) (explaining that an adverse inference was uncalled for where both parties were equally prejudiced by loss of evidence) (citation omitted). Furthermore, Northern Gold also lost data. Northern Gold imaged Italia's phone on September 20, 2022—months after litigation commenced. But Italia apparently dropped his phone from a helicopter in April 2022, and pre-April 2022 data was irretrievably lost. Dkt. 145 at 80. It is more likely than not that Soura obtained the Commitment Letter and Notice of Exercise from the data room. An adverse inference suggesting otherwise would be illogical as it would require the existence of a grand conspiracy to hoodwink Italia (and the court). There is no proof of any such scheme.

[310] Soura Tr. 41, 28-29, 40; *see* JX 1685 (explaining that the data room was closed by SIFT Capital on or around March 27, 2022).

Letter was also printed on SIFT Capital letterhead and signed by Zhang, SIFT Capital's CEO.[311]

The metadata produced to Northern Gold with draft and final versions of the Commitment Letter confirms the authenticity of the documents. The first draft of the Commitment Letter was created on May 7, 2021, and subsequent drafts were created over the next few days.[312] The final Commitment Letter bearing Zhang's signature was created on May 9—the day before the Ilion meeting.[313] Soura countersigned the Commitment Letter on June 4, after Northern Gold and REM OA executed the May 2021 Consent.[314]

### c. The Warrant Agreement

The record also supports the Warrant Agreement's authenticity. The Warrant Agreement was part of the Loan Materials, which were negotiated between the Company's and SIFT Fixed's counsel.[315] There is evidence that drafts of the Warrant Agreement and signature pages to the contract were transmitted by email.

---

[311] JX 210; *see* Soura Tr. 40.

[312] *See supra* note 66. I would conclude that the documents are both authentic and credible regardless of the metadata, based upon the circumstantial evidence discussed above.

[313] *Id.*

[314] *Id.* Northern Gold objects to the admissibility of the drafts. The drafts satisfy Rule 901 for the same reasons as the final Commitment Letter.

[315] JXs 711-20; JXs 726-28; JXs 739-40; JXs 751-52; JX 754; JXs 763-64; JX 803; JXs 836-37; JX 823; JX 1116; Soura Tr. 69-70, 73-74, 76-77, 80; JXs 873-79; Anderson Tr. 616, 618-19; JX 880-81; JX 1133; JXs 1150-53.

For example, counsel sent their clients' signature pages to Pinnacle.[316] Pinnacle released the funds after receiving written authorization from both parties.[317]

Northern Gold raises concerns about the credibility of the Warrant Agreement because there are two different versions of the fully executed document, each with a slightly different signature by Issa.[318] One version is redlined,[319] and the other is clean.[320] Based on the record, it is more likely that the two versions exist because SIFT Fixed's counsel was acting expeditiously, rather than due to nefarious

---

[316] JX 1133; JX 1113; JX 900; JX 860; JX 1107; JX 845; JX 1110; JX 893; JX 867; JX 1109; JX 858.

[317] Soura Tr. 76-77; JX 1150; JX 1663; JX 1727; JX 1107; JX 1147; JX 1140. To the extent that Northern Gold is challenging the authenticity of the Loan Materials more broadly, the analysis and outcome are the same.

[318] *Compare* JX 1337 *with* JX 1380. Northern Gold also argues that the Warrant Agreement is fake because the address listed for SIFT Fixed in the Warrant Agreement is to a "strip mall with no offices" related to SIFT Fixed. *See* Def.'s Answering Br. 58; Soura Tr. 238-39. There is no documentary evidence to support this contention.

[319] JX 1337; *see also* JX 1336; JXs 1372-73.

[320] JX 1380; JX 1383; JXs 1388-89; JXs 1394-96; JX 1401; JX 1451; JX 1530; JX 1537; JX 1647. This version was circulated several times as a fully compiled and executed version.

reasons.[321]  Issa's signatures on the two versions are not so different to my eye that one or both must be forged.[322]

### d. The Notice of Exercise

Lastly, the Notice of Exercise is admissible under Rule 901.  The Notice of Exercise was part of the Loan Materials as Appendix 1 to the Warrant Agreement. Soura testified that in March 2022, Issa said that "he intended to exercise [the warrant] and would be sending [the executed Notice of Exercise] shortly."[323]  Soura said that he then retrieved the signed document from the SIFT Capital data room.[324] Issa's signature on the Notice of Exercise appears similar to his signature on other

---

[321] During closing of the SIFT transaction, SIFT Fixed's Delaware counsel directed Issa and the Company to execute the Warrant Agreement twice.  JX 823; *see* JX 845.  He complied and sent signature pages to the escrow agent.  JXs 1727-33.  After closing, Soura sought to locate a complete version of the Warrant Agreement with signature pages and realized that the document had redlining.  JX 1336; JX 1337.  Kavan explained that Matthews had sent the Company a redlined version "in the interest of time" since he had not "heard back" from his client on the clean version.  JX 1344.  Matthews had directed the Company "to call [the redlined version] the final version."  JX 1344.  Kavan later found the clean version and sent it to D'Arcy, Soura, and RLF before a final version was compiled.  JX 1389; JXs 1394-96; JX 1401; JX 1451; JX 1530; JX 1537.  The clean final version was the one filed as an attachment to the Complaint.  JX 1647.

[322] JX 1915 (citing JX 1336; JXs 1647-48; JX 1468; JX 1722; JX 1539; JX 1673); *see* D.R.E. 901(b)(3).

[323] Soura Tr. 115.  Northern Gold objected to this testimony on hearsay grounds.  As with similar, previously addressed hearsay objections, this testimony is admissible to show Issa's then-present intent to sign and send the documents.  *See supra* notes 80, 214, 216; *see also* D.R.E. 803(3).  I do not consider the testimony proof that Issa signed the documents at that time.

[324] Soura Tr. 114-15.

documents.[325]  This evidence suggests that the Notice of Exercise as signed by Issa

is authentic and not a forgery.[326]

### 2.  Enforceability

Northern Gold also argues that the plaintiffs failed to show that the Warrant

Agreement is a valid and enforceable contract.[327]  A party seeking to enforce a

contract "bears the burden of proving the existence of a contract by a preponderance

of the evidence."[328]  "The elements necessary to prove the existence of an

enforceable contract are: (1) the intent of the parties to be bound; (2) sufficiently

definite terms; and (3) consideration."[329]  The plaintiffs have proven these elements.

First, the Warrant Agreement reflects the Company's and SIFT Fixed's intent

to be bound.[330]  "Whether a party manifested an intent to be bound is a question of

---

[325] JX 1915.

[326] Northern Gold avers that the metadata for the Notice of Exercise shows that it was created on April 20, 2022.  Def.'s Answering Br. 28.  This is incongruous with the date on the face of the document.  JX 1400; *see also* Soura Tr. 94 (testifying that the Notice of Exercise was executed on March 21, 2022); JX 1454.  But given the timing, it is possible that the document as produced was "created" on a file system.  *See Altman v. New Rochelle Pub. Sch. Dist.*, 2017 WL 66326, at *13 (S.D.N.Y. Jan. 6, 2017) ("[T]he 'Created' date found in the metadata 'does not necessarily reflect the authoring date of a document, but . . . more accurately reflects the date the file was 'created' within the file system of a particular device.'").

[327] Def.'s Answering Br. 56-60.

[328] *Harrison v. Dixon*, 2013 WL 4759681, at *2 (Del. Ch. Sept. 5, 2013).

[329] *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *6 (Del. Ch. Feb. 18, 2015) (citation omitted).

[330] JX 210.

fact."[331]  Delaware courts look to "overt manifestation of assent—not subjective intent" when assessing whether a contract was formed.[332]

Anderson overtly manifested the Company's intent when she signed the Warrant Agreement on its behalf.[333]  "That act alone is the strongest evidence of an intent to be bound."[334]  To be sure, "a wet ink, signed version of a contract . . . is not evidence so powerful that it negates all other evidence to the contrary."[335]  The weight of the evidence, however, lends further support to the Warrant Agreement's enforceability.

The Warrant Agreement was negotiated by Soura as authorized by the May 2021 Consent signed by the Company's members.[336]  He engaged in arm's-length negotiations over several months.[337]  Company counsel advised on those

---

[331] *Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020).

[332] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)); *see also UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966, at *9 (Del. Ch. Apr. 30, 2021).

[333] JX 1337.

[334] *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *18 (Del. Ch. June 30, 2023); *see also Eagle Force*, 235 A.3d at 736 ("[T]he act of placing signatures on the signature lines at the end of a contract is so universally recognized as the means of accepting and binding one's self to the contract" that in all but the most unusual case "no other act or statement is ordinarily required.") (citation omitted).

[335] *Kotler v. Shipman Assoc., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019).

[336] May 2021 Consent at 2-4.

[337] *See supra* notes 162-68 and accompanying text.  The limited involvement of D'Arcy or Anderson in negotiating the SIFT transaction is not improper since the May 2021 Consent gave Soura equal authority to act.  May 2021 Consent at 2; *see also* D'Arcy Dep. 325; Anderson Dep. 145; Anderson Tr. 632.  It was also consistent with Soura's general role in

negotiations.[338]   Anderson's execution of the Warrant Agreement was also authorized by the Company's members pursuant to the May 2021 Consent.[339]

SIFT Fixed manifested its intent to be bound when Issa signed the Warrant Agreement.   Northern Gold argues otherwise because there are two different executed versions of the Warrant Agreement.[340]   That is because SIFT's Delaware counsel "never heard back from SIFT concerning the clean version" of the Warrant Agreement and "in the interest of time" sent the Company a signed redlined version of the document that he deemed "the final version."[341]

Second, the Warrant Agreement contains sufficiently definite terms.[342]   It details the number of shares to be issued, the issuance price, and the manner of

---

securing financing.  For example, he had similarly led efforts to secure the PPP loan early in the Company's existence.  *See supra* notes 20, 38-39.

[338] *See, e.g.*, JX 818; *see also supra* note 167.

[339] May 2021 Consent at 2.

[340] Def.'s Answering Br. 58.  Northern Gold argues that the plaintiffs did not prove that SIFT Fixed signed the Warrant Agreement because (1) the address listed for SIFT Fixed on the signature line is to a strip mall in New Jersey, and (2) Issa's signatures on the two versions of the Warrant Agreement do not match.  *Id.*  I am aware of no authority invaliding a contract based on a mailing address.  As to Issa's signature, I have rejected the argument that it is a forgery.  *See supra* Section II.C.1.

[341] JX 1344; *see supra* note 318.

[342] *See Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (explaining that the "relevant inquiry" is whether a "reasonable negotiator" would conclude that "the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential" (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986))).

exercise.[343]  It lacks specific dates, listing "February ___, 2022" as the "Issue Date"

and "February ___, 2027" as the "Expiration Date."[344]  But these omissions are not

fatal.  "[T]ime, unlike price and quantity, is not invariably a material element of a

contract."[345]

Northern Gold contends that the Warrant Agreement is unenforceable because

its terms differ from the Commitment Letter.[346]  The Commitment Letter provides

for the application of Hong Kong law.[347]  The Warrant Agreement includes a

Delaware choice of law provision.[348]  But the Commitment Letter says nothing about

which law governs future Loan Materials.  Its choice of law provision is limited to

"*this* Commitment Letter."[349]

---

[343] JX 1394.

[344] *Id.*

[345] *Hazen v. Miller*, 1991 WL 244240, at \*2 (Del. Ch. Nov. 18, 1991) ("In a proper case the Court may infer a reasonable time for performance.").

[346] *See* Defs.' Answering Br. 60; Commitment Letter at 1 (requiring that definitive documentation be in the same "form and substance" as outlined in the Commitment Letter); *see* Def.'s Answering Br. 60.

[347] Commitment Letter at 4.  Northern Gold also argues that the Commitment Letter's dispute resolution provision is inconsistent with the LLC Agreement and the Warrant Agreement, which have Delaware forum provisions.  Def.'s Answering Br. 60.  The Warrant Agreement is, however, a superseding contract.  *See supra* notes 350-53 and accompanying text.  And the Commitment Letter's dispute resolution provision does not purport to bind members with respect to disputes under the LLC Agreement.  *See infra* note 349 (citing Commitment Letter at 4).

[348] JX 1394 § 4.8.

[349] Commitment Letter at 4 ("*This commitment letter* shall be governed by Hong Kong law, without regard to Hong Kong choice of law principles.  Any dispute, controversy, difference or claim arising out of or relating to *this commitment letter* . . . shall be referred

In any event, "where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict."[350]  The parties' intent that a later contract supersede an earlier one may be evidenced by language to that effect, such as an integration clause in the later contract.[351]  The Commitment Letter was expressly subject to future "[d]efinitive documentation" and "ancillary documents . . . to be executed prior to disbursement of proceeds."[352]  The parties entered into the superseding Warrant Agreement, which contains an integration clause.[353]

---

to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre . . . .") (emphasis added).

[350] *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 (Del. Ch. Oct. 26, 2018).

[351] *See Bioveris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *7 (Del. Ch. Nov. 2, 2017); *see also Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007) ("The new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one.") (citation omitted).

[352] Commitment Letter at 8.  In addition, the May 2021 Consent authorized the Company's entry into agreements contemplated by the Commitment Letter "with such changes as the Member or Officer, as applicable, deem[ed] in his sole discretion advantageous to the Company."  May 2021 Consent at 2.

[353] JX 1394 § 4.9.  Northern Gold argues that other terms of the Commitment Letter were unmet: that there was no "recapitalization of the Company" and that the "Company, the Warrant holders and other members of the Company" did not "enter into an agreement containing Co-Sale, Drag-along and Pre-emptive rights customary and consistent with transactions of this type."  Def.'s Answering Br. 60.  But the parties entered into the superseding Warrant Agreement.

66

Third, there is no dispute that the Warrant Agreement provides for consideration. The Company was given a $10 million loan. In exchange, SIFT Fixed received interest and a warrant.

### D.    Whether the Issuance of Units to SIFT Fixed is Enforceable

Northern Gold also contends that the SIFT transaction is invalid, void, or otherwise unenforceable because: (1) the primary purpose of the transaction was to dilute Northern Gold; (2) the plaintiffs did not prove the transaction's compliance with the federal law as required by the LLC Agreement; and (3) the transaction violates public policy. To the extent that I have jurisdiction to decide them, none of these arguments invalidate the Warrant Agreement or SIFT Fixed's acquisition of units.

#### 1.    Primary Purpose

Northern Gold contends that the SIFT transaction is invalid because its "primary purpose" was to dilute Northern Gold rather than to provide financing.[354] Northern Gold cites no legal basis for applying a "primary purpose" test to invalidate a contract, much less a contract approved by the challenging party. Instead, it relies on precedent in the inapposite contexts of director entrenchment and stockholder disenfranchisement.[355]

---

[354] Def.'s Answering Br. 53-54.

[355] *Id.* (citing cases).

Even if such a test applied (it does not), the record demonstrates that the Company's primary purpose was to secure funding.[356] Italia, D'Arcy, and Soura expected from the outset that the Company would need substantial capital beyond the purchase price.[357] When Soura initiated discussions with SIFT Capital, the $10 million PPP loan was dwindling, traditional loans were unavailable, and the Company was rapidly burning cash.[358] The SIFT transaction provided funds needed to restore the Company's operations—not to mention build the new manufacturing facility in Georgia.

### 2. Compliance with Section 5.3 of the LLC Agreement

Northern Gold also avers that the plaintiffs failed to prove that the issuance of units to SIFT Fixed complies with Section 5.3 of the LLC Agreement.[359] Section 5.3 provides that "no Units shall be Transferred unless such Transfer is in compliance with all foreign, federal and state laws."[360] Northern Gold questions whether the transaction violated federal regulations. The SIFT transaction did not,

---

[356] I do not doubt that Soura viewed the dilution of Northern Gold as an added benefit, given his failing relationship with Italia. The primary purpose of the transaction, though, was to raise capital for the Company.

[357] *See supra* notes 34-35 and accompanying text.

[358] *See supra* notes 40-44 and accompanying text; D'Arcy Tr. 570 (testifying that the Company remains "financially strapped").

[359] *See* Operative LLC Agreement § 5.3; Def.'s Answering Br. 72-84.

[360] Operative LLC Agreement § 5.3 ("Any attempted Transfer of Units not in accordance with the terms and conditions of this Section 5.3, shall be void *ab initio* and shall not bind or be recognized by the Company.").

68

however, involve a "Transfer" of existing "Units" as described in Section 5.3. Rather, it involved the issuance of a warrant, which was later exercised.

Article V of the LLC Agreement governs the "Transferability of Units."[361] Section 5.1(A) provides that "no Member has the right or power to [ ] endorse, sell, give, pledge, encumber, assign, or transfer (a 'Transfer') all or part of his or her Units."[362] Section 5.1(C) allows a member to unilaterally transfer her units subject to a right of first refusal process.[363] The plain terms of these provisions concern the transfer of a member's existing units.[364]

Article III, by contrast, addresses the Company's issuance of new membership interests.[365] Section 3.1(A) authorizes members, "in their sole and absolute discretion . . . to issue Units" and "to cause the Company to issue warrants."[366]

---

[361] Operative LLC Agreement Art. V.

[362] *Id.* § 5.1(A). A "Transferee" is defined as "any individual or entity to whom all or any part of an [sic] Unit is Transferred for any reason or by any means." *Id.* at sched. 1.1; *see also id.* (defining "Member" and "Unit").

[363] *Id.* § 5.1(C).

[364] "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)); *see* LLC Agreement § 11.5(A) (providing that Delaware law governs). "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'" *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[365] Operative LLC Agreement Art. III ("Members; Capital Contribution; and Units").

[366] *Id.* § 3.1(A).

Section 3.1(D) authorizes "the Company to issue to any Person the number and class of Units (and any related warrants, options, or other instruments relating to Units) as may be determined by the Members . . . ."[367] Section 3.2(A) outlines the mechanism for admitting "an additional Member" that receives units from the Company through a warrant.[368]

Article III and Article V address separate matters. To apply Article V to the issuance of new membership interests would render the relevant provisions of Article III surplusage.[369] Because SIFT Fixed's receipt of the warrant falls under Article III, the requirements of Section 5.3 do not apply.

Northern Gold similarly argues that Section 5.3 governs SIFT Capital's transfer of membership interests to SIFT Fixed through the Assignment Agreement.[370] But at the time of the Assignment Agreement, SIFT Capital was not

[367] *Id.* § 3.1(D).

[368] *Id.* § 3.2(A) ("The Members may cause the Company to admit an additional Member . . . as, and upon such terms and conditions as, the Members deem advisable (including, without limitation, pursuant to the provisions of any . . . financing arrangement or other agreement authorized by the Members whether by the issue of Units, options or warrants or similar instruments.").

[369] *See Osborn*, 991 A.2d at 1159 (stating that the court must construe the contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage" (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. Mar. 8, 2010))); *see also In re Kinder Morgan, Inc. Corp. Reorg. Litig.*, 2014 WL 5667344, at *3 (Del. Ch. Nov. 5, 2014).

[370] Def.'s Answering Br. 70-71. This argument concerns an aspect of the SIFT transaction that is distinct from the issuance of the warrant (or subsequent receipt of units after

70

a "Member"[371] and the warrant was not "Units."[372]  The Commitment Letter was an agreement to purchase a warrant conditioned on final documentation and the provision of a $10 million loan.[373]  At most, SIFT Capital assigned to SIFT Fixed a conditional right to purchase a warrant; it did not assign an actual warrant or units.[374]

### 3.    Public Policy

Relatedly, Northern Gold argues that the SIFT transaction is void as a matter of public policy because it violated regulations imposed by the International Traffic in Arms Regulations (ITAR) and the Committee on Foreign Investment in the United

---

exercising the warrant).  I have addressed it here given the overlap with Northern Gold's other argument about Section 5.3.

[371] Operative LLC Agreement at sched. 1.1; *see supra* note 254 (defining "Member").

[372] Operative LLC Agreement at sched. 1.1; *see supra* note 251 (defining "Unit").

[373] Commitment Letter at 3-4.

[374] JX 1594 § 2.1.  Northern Gold argues that Section 5.3 applies because the Commitment Letter gave SIFT Capital "equitable or beneficial equity ownership based on contractual rights to shares."  Def.'s Answering Br. 71-72.  The case law relied on by Northern Gold does not support this position.  Each of the cited cases considered equitable or beneficial ownership in the stockholder standing context.  *See In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at *6 (Del. Ch. June 28, 2004) (observing that a warrant confers beneficial ownership of the underlying stock only where the plaintiff already paid for the stock, no intermediate step to execute the warrant is necessary, and there is no convertibility feature to the warrant); *Pennington v. Neukomm*, 1973 WL 463, at *3 (Del. Ch. Oct. 3, 1973) (addressing the plaintiff's standing to press derivative litigation where he had entered into a separation agreement requiring the defendant to transfer stock to the plaintiff), *aff'd*, 344 A.2d 386 (Del. 1975); *Jones v. Taylor*, 348 A.2d 188, 192 (Del. Ch. 1975) (holding that the plaintiff had standing to bring a derivative suit where she entered into a contract in which her mother transferred a possessory interest in stock in exchange for a promise to execute a will bequeathing the plaintiff one-half of the stock upon the mother's death).  Here, I am resolving a matter of contract interpretation, not standing.

71

States (CFIUS).[375] The Company insists that the transaction complied with both sets of regulations.[376]

Bargains are "unenforceable on grounds of public policy if legislation provides that [they are] unenforceable."[377] Yet, I do not know—and cannot determine—whether federal law was violated. There is no indication in the record that the relevant federal authorities have flagged the SIFT transaction, pursued an investigation, or begun enforcement proceedings. I lack the subject matter jurisdiction to resolve a challenge to the transaction's compliance with ITAR or CFIUS.[378] Both ITAR and CFIUS contemplate a comprehensive review process and provide for administrative remedies.[379] The agencies tasked with administering these regulatory regimes are best suited to address potential violations.

---

[375] Def.'s Answering Br. 73-85. The statutory authority for ITAR is 25 U.S.C. § 2751 *et seq.*, and the statutory authority for CFIUS is 50 U.S.C. § 4565.

[376] *See supra* note 246.

[377] Restatement (Second) of Contracts § 178 (1981); *see PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1067 (Del. 2011) ("Under Delaware common law, contracts that offend public policy or harm the public are deemed void as opposed to voidable.") (emphasis in original).

[378] *See Walker v. City of Wilmington*, 2014 WL 4407977, at *7-9 (Del. Ch. Sept. 5, 2014) (dismissing equitable claim for lack of subject matter jurisdiction where plaintiff failed to first exhaust adequate remedy at law through the designated administrative body).

[379] 22 C.F.R. §§ 127-28 (ITAR); 31 C.F.R. § 800 (CFIUS); 50 U.S.C. § 4565(e)(2) (providing that "[a] civil action challenging an action or finding [by the administrative agency administering CFIUS] may be brought only in the United States Court of Appeals for the District of Columbia Circuit"); *see also Aizupitis v. Atkins*, 2009 WL 3589530, at *6 (Del. Ch. Oct. 28, 2009); 10 *Del. C.* § 342.

## E. Whether SIFT's Admittance as a Member Complied with the LLC Agreement

Finally, Northern Gold argues that SIFT Fixed's membership is "null" and "void" under the LLC Agreement.[380] Specifically, it asserts that it did not authorize the Company to give SIFT Fixed a membership interest, as the LLC Agreement requires.[381]

Section 4.1(A) of the LLC Agreement permits the Company's members to act "without a meeting," "vote to authorize any action in writing," and to "by the[ir] written consent" give "a single Member, acting alone" the power "to act on behalf of or to bind the Company."[382] Sections 3.1 and 3.2 permit the members to issue "Units [] and any related warrants" and "cause the Company to admit an additional Member."[383] Consistent with these provisions, the May 2021 Consent authorized "any Member or Officer, acting alone" to execute "the Commitment Letter and all documents relating thereto or contemplated thereby . . . without any further act, vote

---

[380] Def.'s Answering Br. 39 ("[P]ursuant to the Operative LLC Agreement or the 'Amended LLC Agreement,' the transaction by which SIFT002 claims to own Units and membership in the Company is unauthorized, null, void or voidable, and of no further force and effect.").

[381] *Id.* at 38-39 (citing Sections 3.1(A), 3.1(D), 3.2, and 4.1(A) of LLC Agreement dated May 14, 2021).

[382] Operative LLC Agreement § 4.1(A); *but see* Def.'s Answering Br. 39 (suggesting that the transaction is void because no meeting to admit SIFT Fixed took place and citing *Box v. Box*, 1996 WL 73575, at *14 (Del. Ch. Feb. 15, 1996)).

[383] Operative LLC Agreement §§ 3.1-3.2. Section 4.2(ix) further permits the Company's members to take "all actions deemed necessary" to secure financing. *Id.* § 4.2(ix).

or approval of any Member."[384]  By authorizing the Commitment Letter, Italia authorized the Loan Materials—including a warrant—and the admission of SIFT Fixed as a member upon the exercise of its warrant.

The LLC Agreement's definition of "Member" contemplates that "a Person will automatically be admitted as a Member when they are issued Unit(s)."[385] Section 3.2(A) provides that, once the members have "cause[d] the Company to admit an additional Member," "[n]o such admission . . . shall require the consent or approval of any Member."[386]  SIFT Fixed was therefore a member as soon as it was issued units irrespective of when and whether Soura updated Schedule A to the LLC Agreement.

## F.    Whether the Plaintiffs Are Entitled to a Remedy

The plaintiffs have proven their claim under Section 18-110 by a preponderance of the evidence.  They have shown that the SIFT transaction was authorized by the May 2021 Consent (and February 2022 Consent) and that SIFT

---

[384] May 2021 Consent at 2; *see also* JX 324; JX 264; JX 267; JX 273; JX 276; JX 279 (permitting "any Governor and Officer" to do the same).

[385] Operative LLC Agreement at sched. 1.1.

[386] Operative LLC Agreement § 3.2(A).  To the extent there is any deviation between the LLC Agreement and the terms of the SIFT transaction, the February 2022 Consent affirmed that the May 2021 Consent was "validly entered into and to the extent necessary constitutes an amendment to the LLC Agreement."  JX 1274.  The LLC Agreement similarly provides that "any written consent executed by the Members will be deemed an amendment to this Agreement to the extent necessary to effectuate the subject matter of such written consent." Operative LLC Agreement § 11.4.

Fixed was validly admitted as a member of the Company in accordance with the LLC Agreement. None of Northern Gold's arguments to the contrary require a different conclusion. Nor has Northern Gold proven its counterclaim.

Accordingly, the plaintiffs are entitled to a declaration that before the Capital Raise, SIFT Fixed was a 2.5% member of the Company, REM OA was a 48.75% member, and Northern Gold was a 48.75% member.[387]

The plaintiffs also seek an award of their fees and costs under Section 11.7 of the LLC Agreement, which provides:

> In any proceeding by which a Member or the Company either seeks to enforce its rights under this Agreement (whether in contract, tort, or otherwise) or seeks a declaration of any rights or obligations under this Agreement, if the Company and/or the Members are the prevailing party, to the fullest extent permitted by law, they shall be awarded reasonable costs and expenses (which shall be payable by the non-prevailing party), including reasonable outside attorneys' fees and expert witness fees incurred to resolve the dispute and enforce the final judgment.[388]

The plaintiffs each brought this suit as a "Member,"[389] seeking a declaration under the LLC Agreement about the membership of the Company. Because SIFT Fixed was a 2.5% member of the Company and REM OA was a 48.75% member

---

[387] Further proceedings would be necessary to make that assessment, to the extent that the parties are inclined to pursue claims concerning the Capital Raise. *See supra* note 244 (explaining that the Capital Raise was not the subject of trial).

[388] Operative LLC Agreement § 11.7.

[389] Although the plaintiffs brought this action together as "Members," each plaintiff also brought this suit as a "Member."

immediately before the Capital Raise, the plaintiffs were and continue to be "Members."[390] The plaintiffs have prevailed in this action. Nonetheless, further proceedings are necessary to resolve the plaintiffs' entitlement to costs and expenses.[391]

## III. CONCLUSION

Judgment is entered for the plaintiffs under 6 *Del. C.* § 18-110. The plaintiffs are entitled to a declaration that immediately before the Capital Raise, SIFT Fixed was a 2.5% member of the Company, REM OA was a 48.75% member of the Company, and Northern Gold was a 48.75% member of the Company. The parties shall confer on a proposed order to implement this decision and file it within 14 days.

---

[390] *See N. Gold*, C.A. No. 2022-0308-LWW, at 26-31 (Del. Ch. Oct. 10, 2022) (TRANSCRIPT) (interpreting Section 11.7 of the LLC Agreement).

[391] A letter requesting supplemental submissions on this issue will follow.